Robert KAY

v.

Edward MENARD.

No. 97–535–Appeal.

Supreme Court of Rhode Island.

June 27, 2000.

Donald A. Woodbine, Phillip S. Rosen, for Plaintiff.

John B. Reilly, Warwick, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

Ten years ago, Robert Kay tumbled down an elevator shaft from the fourth floor elevator opening to the basement of the Mongeon Building in the City of Woonsocket. He was seriously injured. He sued the owner of the building, Edward Menard, accusing Menard of negligence. A Superior Court trial jury awarded him $275,000 for his injuries and damages. Menard, in this appeal, challenges the final judgment entered in the case.

### Facts/Case Travel

Robert Kay (Robert or the plaintiff) and Susan Bergeron (Susan), his girlfriend, lived together in a fourth-floor apartment in the five-story Mongeon Building. The building contained several retail businesses, as well as residential apartments. Edward Menard (Menard or the defendant), lived in a basement apartment and operated a retail business on the second floor of his building.

The building contained a single manually operated elevator. For a tenant to use the elevator, he or she first would summon the elevator by pressing a button next to the elevator door located in the hallway on each floor. That door could not be opened until the elevator had reached the particular floor from which the button had been pressed. When the elevator reached that floor, a mechanical interlock, designed to keep all the doors locked, then would disengage the door-locking mechanism, permitting the particular door to be opened. The interlock door system was designed to prevent any door from being opened when no elevator was present at a particular floor in order to prevent anyone from falling into the elevator shaft.[1] Once the hallway elevator door was disengaged, the door could then be opened from the hallway and the person intending to use the elevator then would reach in and lift a wire inner-mesh gate attached to the elevator in order to enter the elevator. He or she, after entering, then would have to lower the wire mesh gate until it touched the floor of the elevator; otherwise, the elevator would not operate.

Every evening, the defendant, Menard, who lived in a basement apartment, typically would disable the elevator at his basement floor level until the following morning, by raising the inner-mesh gate a few inches above the elevator's floor. This prevented the elevator from being operated and provided some measure of security for his tenants. When a tenant, during evening and late hours, wished to use the elevator, he or she would press the button near the elevator door in the hallway where he or she was located. A loud

1. Professor Marc H. Richman, a noted expert and scholar in the field of engineering, testifying for the plaintiff, noted the purpose of the mechanical interlock. He described it as follows:

   "[N]ot until the elevator is at the right level can you * * * open the doors up. * * * There is a mechanical interlock that keeps that door latched in place. Only when the elevator has come to your floor level can you twist the handle, the knob, and pull the door open because when the elevator comes there it releases the latch holding those doors shut. Now you can open the doors up, lift the gate up and go into the elevator."

buzzer then would sound in the defendant's basement apartment, and he would respond by lowering the elevator's inner-mesh gate to the elevator's floor, thereby setting the elevator in motion to respond to the floor from which the button had been pressed. Having explained the workings of the Mongeon Building's elevator, we turn now to the events that generated the instant litigation and the appeal now before us.

Sometime just before April 11, 1990, Robert proposed marriage to Susan, his girlfriend. She accepted his proposal. Later, on April 11, at about 6 p.m., they decided to celebrate their recent betrothal and went out to dinner at a restaurant across the street from the Mongeon Building. They dined and drank and, when leaving, ordered a take-out dinner for Menard, who they knew would be in his apartment. They returned to the Mongeon Building, and entered by a third-floor entrance which was accessible from the street sidewalk because the building was situated on a hillside. One of them pressed the elevator button to summon the elevator to the third floor. When the elevator reached that floor, they used it to go down to Menard's basement apartment and to give him the take-out dinner they had purchased for him. They stayed with Menard for a short time, and then left to continue to celebrate their betrothal at the Hillside Tavern.

Celebrate they did, for several hours, until Robert, with bubbling enthusiasm, toasted his future bride by telling Susan that marriage would be like a ball and chain for him. That brought to a close the celebration, and Susan left. Robert wobbled out after her, seeking to apologize. Susan forgave him, and they returned to the Mongeon Building at about 10:30 p.m. When they did, they entered again through the third-floor side entrance and then walked up the stairway to their fourth-floor apartment. Robert told Susan that he was going to go down to visit

Menard to see if all was well with him, and to inquire about whether he enjoyed the take-out dinner. He told Susan that first he was going into the apartment to get a sweater. As he was walking towards the apartment, he heard Susan press the elevator button and heard the buzzer sound for the elevator.

When Robert came out of the apartment, he walked to the elevator, assumed the elevator had reached his floor, opened the elevator door and leaned down to lift the wire mesh gate. While doing that, he turned his head to look for Susan and said, "are you coming." There was no elevator waiting for him, and Robert's momentum in leaning down to pick up the wire mesh gate carried him into the open elevator shaft. He fell four floors down onto the top of the elevator that was still at the basement level.

As would be expected, Robert suffered serious multiple injuries, and he was taken to Landmark Hospital in Woonsocket. At the hospital, his blood alcohol content (BAC) was recorded at .23 percent. He later was transferred to the Rhode Island Hospital trauma unit. There, a second blood test revealed that his BAC level had risen to .25 percent. Without intending to be facetious, Robert, although dead drunk, fortunately was still very much alive.

In January 1993, Robert sued Menard, asserting in his Superior Court civil complaint that Menard had been negligent in failing to maintain his building elevator and door in a safe condition. After trial, a Superior Court jury returned a verdict in favor of Robert and awarded him damages of $550,000. However, because the jury found Robert to have been comparatively negligent, it assessed his negligence at fifty percent and then reduced his award to $275,000, as required by the trial justice's instruction. Robert's motion for a new trial or additur, and Menard's motion for a new trial all were denied by the trial justice. Menard timely appealed.[2]

---

**2.** See *Kay v. Menard,* 727 A.2d 665 (R.I.1999)   (per curiam).

In his appeal, Menard alleges that the trial justice erred in: (1) permitting introduction of evidence of his intoxication; (2) failing to instruct the jury on the doctrines of assumption of the risk, and "looking but failing to see;" (3) failing to instruct the jury that passengers are not prohibited from using freight elevators; (4) failing to give a curative instruction after the plaintiff's counsel suggested in his closing argument that the defendant was entitled to rebuttal; (5) giving inappropriate instructions with respect to life and work life expectancy tables; (6) failing to instruct the jury to calculate the present-day value of any damage award; (7) instructing the jury to consider unproven future medical expenses; and, (8) permitting the jury to consider unproven scarring on the plaintiff.

Additional facts will be presented as needed in the course of reviewing those contentions.

### 1. Evidence of Intoxication

In this civil action for damages, the defendant's fifth special defense and the pretrial discovery procedures thereafter undertaken by both parties made clear to the trial justice that both the plaintiff and the defendant had been intoxicated at the time of the plaintiff's near fatal plunge into the elevator shaft. Robert's blood alcohol content, when tested at the hospital where he was taken within minutes of his fall, was .23 percent. It rose shortly thereafter to .25 percent. He was intoxicated. Menard had consumed some twelve to fourteen glasses of Scotch on that day and also was intoxicated, but unlike his friend Robert, he was feeling no pain.

Confronted with that information from the Court file, and as well by motions in limine filed by both the plaintiff and the defendant seeking to have the trial jury know only of the other's intoxication and not of his own, the trial justice properly responded to the respective motions by conducting a *Handy v. Geary* hearing.[3]

At the conclusion of that hearing, the trial justice determined that he would permit evidence of intoxication on the part of both parties to be introduced at the trial. He additionally permitted the plaintiff to introduce evidence of the defendant's alcohol abuse during a short period, extending over several months from late 1989 to the date of plaintiff's fall on April 11, 1990. The trial justice referred to that time-period limitation as being a "narrow corridor," in which the plaintiff might reasonably explore whether the defendant's daily periods of intoxication proximately resulted in his failure to correct, repair or replace the mechanical interlock safety feature in the hallway elevator entrance door. The trial justice noted:

"the rate and regularity of his drinking during this period of time is significant, and a jury could find it to be related to his actions, particularly by his own admission that he was shown by Miss Bergeron that the elevator door could be opened without the elevator car being present. There is no testimony at all that he did anything after being shown that on two occasions. Thus, his significant alcohol consumption could relate to his actions as it impacts on whether he exercised due care in these circumstances."

The defendant here on appeal contends that the trial justice erred in permitting the plaintiff to introduce evidence of the defendant's intoxication both at the time of, and for the delineated period of time prior to, the plaintiff's fall and injuries. We disagree with that contention.

Both the plaintiff and Susan, who formerly worked as a secretary to Menard, testified as to unusual amounts of liquor that Menard had been drinking in the several months preceding the day of the incident in question. They each had occasion to see Menard on a daily basis and they testified that, over the course of Menard's waking hours, he would drink constantly, consuming at least two drinks per

---

**3.** *See Handy v. Geary*, 105 R.I. 419, 431, 252     A.2d 435, 441–42 (1969).

hour and consuming approximately fourteen glasses of Scotch and water, mostly Scotch. They each testified that they would have to help Menard to the bathroom, and that he would have to reach for wall and counter assistance.

Menard attempted to contradict what the plaintiff and Susan had said of his drinking habits by admitting that from at least February 1990, and up to the time of the plaintiff's fall, he only drank up to ten glasses of Scotch every day. He also added, "I drank beer, I drank scotch, I drank Vodka. Pick a name and chances are I drank it."

In light of that evidence concerning the extent and nature of the defendant's drinking habit, we are satisfied that the trial justice did not err or abuse his discretion in permitting the plaintiff to explore that habit at trial. It was important for the jury to determine whether the defendant's almost constant state of inebriation was the real cause for his ignoring and/or inaction in failing to correct the dangerous mechanical interlock defect in the fourth-floor hallway door leading to the elevator in his building. Certainly the time-period coincidence between when the complaints about the doorlock were being made and when the defendant was inebriated on a daily basis, was relevant for the jury to hear and consider. The jury was required to apportion fault of the parties for purposes of comparative negligence, and because that required the jury to consider each party's total culpable conduct with respect to the cause and happening of the plaintiff's tumble into the open elevator shaft, the evidence concerning each party's intoxication, in particular, on the day of the plaintiff's fall, was both relevant and material, and its relevance certainly outweighed any prejudice the defendant now contends resulted.

*Peters v. Gagne,* 98 R.I. 100, 199 A.2d 909 (1964), relied upon by the defendant to support his prejudicial error contention, concerned a civil action for negligence and damages stemming from a plaintiff's fall at 10:30 p.m. in a hole that had been excavated on her property earlier that day. This Court concluded that admission of evidence that the plaintiff had consumed "one old fashioned" four hours earlier, was "clearly prejudicial" to her, and a defendant's verdict was reversed and a new trial was ordered. *Id.* at 106–07, 199 A.2d at 912–13. This Court was quick to point out that proof of *intoxication* could certainly be relevant in a negligence case, " 'while the mere fact of drinking intoxicating liquor' " would be "unfairly prejudicial" and not admissible. *Id.* at 110, 199 A.2d at 914 (Roberts J., concurring). In his concurrence, Justice Roberts noted that "[w]here intoxication is put into issue by an allegation that it constituted an antecedent act of negligence upon which liability is predicated or that it created a condition indicating improbability of a capacity to exercise due care, such evidence of the consumption of an alcoholic beverage may have such probative force on that issue as to warrant its admission into evidence." *Id.* at 108, 199 A.2d at 913–14. The determination that evidence of intoxication is relevant in a negligence case is in accord with the case holdings in a majority of the other jurisdictions and persuades us that the defendant's claim of error concerning the admission of evidence of defendant's intoxication is without merit.

The facts in the case now before us indicate that by the defendant's fifth special defense, the extended discovery requests by both parties, as well as the motions in limine filed by both parties, *intoxication* on the part of both parties had been put in issue. Thus, when, as here, the comparative negligence of each party had been placed in issue, evidence concerning the extent to which each party's ability to act as a reasonable prudent person under the circumstances existing at the time of the plaintiff's near fatal plunge into the open elevator shaft was both relevant and material. The essential consideration before the trial justice during the *Handy* hearing, at which each party

sought to exclude evidence of his own intoxication, but to present evidence of the other's intoxication, was whether in a comparative negligence case setting, one party should be permitted to shield his total acts of fault from the jury, while exposing all the other party's blameworthy conduct. *See Amend v. Bell,* 89 Wash.2d 124, 570 P.2d 138, 141 (1977).

■ Comparative negligence properly refers only to a comparison of the fault of the plaintiff with that of the defendant and does not necessarily result in a simple division of damages; instead, it results in a reduction of the recoverable damages reduced in proportion to the total fault of the plaintiff as compared with the total fault of the defendant. *See* W. Prosser, *Comparative Negligence,* 51 Mich.L.Rev. 465, 465 n. 2 & 482 (1953). While voluntary intoxication is not negligence per se, neither does it excuse one's negligence in failing to act as a reasonable and prudent person under the circumstances. *See* 57A Am. Jur.2d *Negligence* § 196 (1989). As this Court long ago noted in *Vizacchero v. Rhode Island Co.,* 26 R.I. 392, 399, 59 A. 105, 108 (1904), "[i]ntoxication does not relieve a man from the degree of care required of a sober man in the same circumstances." *See also* 57A Am.Jur.2d *Negligence* at § 943.

■ In this case, the trial evidence was more than sufficient to permit the trial jury to conclude and find that on the night in question, both the plaintiff and the defendant were intoxicated to the extent that intoxication impaired their respective abilities to act as reasonable and prudent persons. Thus, whether that impairment proximately caused the plaintiff to fall, or caused the defendant's failure to act to prevent the elevator door from being opened without the elevator being at the fourth floor, was a proper question of fact for the trial jury to consider and determine.

■ We are also persuaded that the trial justice properly instructed the trial jury with regard to its consideration of the evidence concerning both the plaintiff's and defendant's intoxication. The trial justice instructed the jury:

"There's been evidence in this case of intoxication. Our Supreme Court has defined intoxication as follows: Intoxication comprehends a situation whereby [sic] reason of drinking intoxicants an individual does not have the normal use of his physical or mental faculties thus rendering him or her incapable of acting in a manner in which an ordinary, prudent and cautious person in possession of his or her faculties using reasonable care would act under like conditions. Whether a person is exercising due care at the time of the accident is usually a question for the jury, not the Court, as I have instructed you before. Voluntary intoxication, I instruct you, will not excuse a person for the failure to use a degree of care reasonably expected of a sober person."

The trial jury's later assessment of comparative fault at fifty percent for each party indicates that it properly evaluated that evidence in accordance with the trial justice's instruction.

## 2. Assumption of the Risk and "Looking But Failing to See"

The defendant contends that the trial justice should have instructed the jury on both the doctrine of assumption of the risk and the "looking but failing to see" doctrine. That assertion has no merit.

■ Concerning his assumption of the risk contention, there is absolutely no evidence in the record showing that the plaintiff ever was aware that the elevator had not arrived at the fourth floor, nor that he appreciated the danger created by his opening of the elevator door but nevertheless, knowingly assumed the risk of his injuries by stepping into what he believed to be the elevator. *See Lang v. The Red Parrot, Inc.,* 746 A.2d 142 (R.I.2000) (per curiam). Consequently, an assumption of

the risk defense was unavailable to the defendant.

The doctrine of "looking but failing to see," likewise, is inapplicable in this case setting. That doctrine had been applied in cases where a plaintiff's contributory negligence, if proven, would preclude recovery as a matter of law. *See Kennedy v. N.Y., N.H. & H.R.R. Co.*, 43 R.I. 358, 112 A. 429 (1921); *Beerman v. Union R.R. Co.*, 24 R.I. 275, 52 A. 1090 (1902). The last case to address the doctrine was decided in 1970. *See Ionata v. Groise*, 107 R.I. 478, 268 A.2d 444 (1970).

■■■ In 1971, the Legislature enacted G.L.1956 § 9–20–4 (P.L.1971, ch. 206, § 1). This abolished the affirmative defense of contributory negligence, substituting in its place comparative negligence, which no longer bars a plaintiff's action. Contributory negligence, and what remains of the doctrine of "looking but failing to see" have lost their fatal sting. They are relevant today only for purposes of proving that a plaintiff or a defendant, at the time of the incident giving rise to the action, was not acting in a reasonable and prudent manner. Thus, in this jurisdiction, the net effect of what is formally termed contributory negligence, and what is now a plaintiff's comparative negligence, as well as of what is left of the "looking but failing to see" doctrine, is essentially the same; namely, they both serve to either lessen a plaintiff's recovery or to increase a defendant's liability. Consequently, neither serve as a bar to a plaintiff's cause of action, as sought here by the defendant.

### 3. The Elevator Instruction

■■■ The defendant contends that the trial justice erred when he failed to instruct the jury that passengers are not prohibited by law from using freight elevators.

During the trial, the trial justice took judicial notice of a regulation promulgated by the Department of Labor, Division of Occupational Safety, Elevator Inspection.

That regulation defines a freight elevator as:

> "An elevator primarily used for carrying freight and *only which the operator and the persons necessary for loading and unloading freight are permitted to ride.*" (Emphasis added.)

The plaintiff requested the trial justice to instruct the jury that this regulation did not prohibit "freight from being carried on a passenger elevator or for that matter, passengers being carried on freight elevator." However, the clear language of the regulation limits the use of a freight elevator only to those people who are necessary to the transportation of freight, namely, elevator operators and freight handlers. Consequently, the trial justice did not err when he failed to give the defendant's enigmatic requested instruction, which on the facts presented, had little or no relevant significance.

At the time of the plaintiff's accident (after 10:30 p.m.), the elevator was not being used as a freight elevator; rather, it only was available to residential tenants in the building for their personal use. Thus, the elevator in the building served a dual purpose. During daytime hours the elevator served as a freight elevator to accommodate the various commercial uses in the building. At night, it was made available to residential tenants in the building, thus serving as a residential elevator for the building's tenants. Consequently, the relevant statute at the time of the accident was the Residential Landlord and Tenant Act.

■■■ Pursuant to the Residential Landlord and Tenant Act, a landlord owes a duty of care to a tenant to maintain elevators in good and safe working order and condition. G.L.1956 § 34–18–22(a)(4). However,

> "a statutory violation does not relieve a jury of its responsibility to find a breach of a duty of care * * * but rather serves as prima facie evidence of liability, 'which, unless rebutted by evidence in

favor of the defendant, entitles the plaintiff to recover.'" *Errico v. LaMountain,* 713 A.2d 791, 794 (R.I.1998) (quoting *Rossi v. Ronci,* 63 R.I. 250, 254–55, 7 A.2d 773, 776 (1939)).

■ As a landlord and elevator owner, the defendant had a statutory duty to maintain the elevator in good and safe working order and condition. Based upon his own admissions, he breached that duty. He testified that he knew about the complaints concerning the outer door of the elevator on the fourth floor but that he failed to repair it because he didn't think that it was a problem. Because he "knew or should have known about that condition and yet failed to take corrective action, then a jury was entitled to conclude that defendant[ ] had breached [his] duty of care to [the plaintiff]." *Errico,* 713 A.2d at 794.

### 4. Closing Arguments

The defendant avers that the trial justice erred when he failed to give the jury a curative instruction after counsel for the plaintiff had stated in his closing argument that "[i]f I'm wrong I'm sure [defense counsel] will correct me." He asserts that this statement impermissibly suggested to the jury that defense counsel, who already had concluded his closing argument, somehow was required to rebut the plaintiff's closing argument. He contends that such a suggestion could have led the jury to question his failure to anticipate what counsel for the plaintiff's closing statement would be, and to surmise therefrom, that he conceded his case to the plaintiff. The record indicates, however, that while defense counsel now believes this issue to be error, he never objected to plaintiff counsel's disputed statement when it was made.

■ Failure to object at the time an alleged improper remark is made during closing arguments precludes a party from raising such an objection for the first time on appeal. *See Barnes v. Quality Beef Co.,* 425 A.2d 531, 535 (R.I.1981). Just like the plaintiff in *Barnes,* here,

"[n]ot only did plaintiff fail to object to defense counsel's remark to the jury, but [he] further neglected to make a motion to pass the case at that point in the trial. Had [he] done so the trial justice, from his 'front-row seat,' could have made a determination as to the effect of the allegedly improper statement upon the jury." *Id.* at 534 (citing & quoting *State v. Pailin,* 114 R.I. 725, 729, 339 A.2d 253, 255 (1975)).

Because the defendant failed to take appropriate and timely action to preserve this issue at the trial level, he cannot raise it here for the first time on appeal.

### 5. The Life and Work Life Expectancy Tables

During trial, the plaintiff's physician, Dr. Peter Trafton (Dr. Trafton), testified that as a result of his injuries, the plaintiff would be unable to return to his former employment in residential construction. Asked whether the plaintiff could engage in any other type of employment in the future, the defendant objected, asserting that Dr. Trafton was not qualified as a vocational rehabilitation expert to give an "opinion on the universe of jobs and employment opportunities which are available in the economy." The objection was sustained. Doctor Trafton later did testify that the plaintiff could engage in activities such as walking around on level ground, limited driving and light activities involving the use of his arms, but that he would not be able to work at a "prolonged sitting job." Subsequently, the plaintiff introduced the plaintiff's life and work life expectancy tables. The defendant objected to the work life expectancy tables, contending that the plaintiff had not presented an expert to testify about his residual work life capacity. Both tables were admitted.

■ "Life [and work life expectancy] tables * * * are for the assistance of the jury and are not controlling." *Turner v. Maxon,* 53 R.I. 164, 166, 165 A. 372, 373

(1933). "To be admissible they must be applicable to the facts of the case in which they are introduced." *Id.* Section 9–19–38(a) provides in pertinent part:

"In any proceeding commenced in any court * * * when it is necessary to establish the expectancy of continued life or work life expectancy of any person * * * 'The Vital Statistics of the United States (Life Tables)' or 'Tables of Working Life of the United States' * * * shall be admissible in evidence as competent evidence of such matter. The admissibility of evidence provided for in this section shall not be deemed to render inadmissible evidence as to the health, constitution, habits, or occupation of the person or any other evidence otherwise admissible under the laws of this state."

Section 9–19–38(a) clearly permits a party to introduce life and work life expectancy tables when the life or work life expectancy of a person is at issue in a particular case. Their relative value later may be challenged in cross-examination by the opposing party, as well as through the introduction of other competent evidence.

In this case, evidence was presented by the plaintiff demonstrating that, as a result of his injuries, he was incapacitated and was unable ever to return to his former employment. Consequently, the life and work life expectancy tables were properly admitted. We conclude that the trial justice did not err in admitting the life and work life expectancy tables to assist the trial jury in calculating the plaintiff's future work life expectancy damages.

### 6. Evidence of Present–Day Value

The defendant asserts that the trial justice erred when he failed to instruct the jury to reduce the plaintiff's future damage award for the loss of his expected earnings over the course of his work life expectancy to its present-day value. The plaintiff counters that the defendant waived his right to raise this assertion, because he failed to provide the jury with any evidence or method by which the jury could have calculated the reduction of those damages to their present-day value, and because he failed to move for judgment as a matter of law on the ground that no evidence of present-day value had been presented to the jury.

Rhode Island case law has consistently recognized the practice of reducing damage awards for loss of future earning capacity to their present-day value. *See, e. g., Blue Ribbon Beef Co. v. Napolitano,* 696 A.2d 1225, 1229 (R.I.1997) (determining the date to which "estimated lost-profits damages *should have been discounted* to obtain their then-present value") (emphasis added); *Markham v. Cross Transportation, Inc.,* 119 R.I. 213, 223, 376 A.2d 1359, 1364 (1977) (upholding calculations of the present-day value of future income where those calculations considered economic trends in determining loss).

"[C]alculating the present [day] value of future damages involves two steps: estimating the future stream of money; and discounting the future stream to present [day] value." *Reilly v. United States,* 665 F.Supp. 976, 992 (D.R.I.1987) (citing *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 537–38, 103 S.Ct. 2541, 2551, 76 L.Ed.2d 768 (1983)). To assist a trial jury in making its calculations, present-day value tables may be presented to a jury, but these tables are not controlling. *See Turner,* 53 R.I. at 166, 165 A. at 373. However, as we have stated previously, "allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level." *State v. Morris,* 744 A.2d 850, 859 (R.I.2000) (quoting *State v. Bettencourt,* 723 A.2d 1101, 1107–08 (R.I.1999)).

In the instant case, defense counsel, in his summation to the jury, at no time mentioned that it should discount any potential damages to their present-day value. Such omission, we can assume, was because he expected plaintiff's counsel to do

so, or in any event, that the trial justice would do so when instructing the jury. The plaintiff's counsel, in arguing to the jury, did discuss the plaintiff's damages and did discuss methods of calculation for those damages. He then suggested approximate amounts that it could award from those calculations. However, he failed to mention anything about discounting any of the plaintiff's damages to their present day value. Defense counsel, we note, failed to move for judgment as a matter of law on the ground that no evidence of present-day value had been presented to the jury, and offered no objection to the plaintiff's argument concerning damages at the time that it was made.

It was only after final arguments had been concluded, and after the court's instruction had been given to the jury, that defense counsel first requested the trial justice to re-instruct the jury to discount the damages for future loss of earnings to their present-day value. The trial justice was unable to do so because there had been no evidence presented to the jury about such present-day value calculation. Consequently, the defendant's belated request for an instruction was ineffective and, if given, would have appeared to be a repudiation by the trial justice of plaintiff's counsel's closing argument, and certainly would have been prejudicial to the plaintiff.

■■■ We conclude, therefore, that because of defense counsel's failure to move for judgment as a matter of law or to make timely objection, the trial justice did not err in refusing to re-instruct the jury to discount the plaintiff's damage award for future loss of earnings to its present-day value. We note for the trial bar, however, that in view of the complexity of these calculations, we believe that a trial jury ordinarily is incapable of making such a determination without the assistance of expert testimony. Consequently, in the future, we will expect the party seeking those damages to present specific evidence of their present-day value to the jury.

## 7. Future Medical Expenses

The defendant next asserts that the jury should not have been permitted to calculate the plaintiff's future medical expenses because of the inadequate evidence presented by the plaintiff on this issue. He contends that the plaintiff's medical expert gave a vague estimate of the cost of future medical expenses; consequently, any such jury award necessarily was speculative.

■■■ "This Court has never determined that entitlement to damages for future medical expenses arising from injuries incurred as a result of the negligence of another is dependent upon a calculation made with mathematical precision." *Shepardson v. Consolidated Medical Equipment, Inc.,* 714 A.2d 1181, 1184 (R.I.1998) (per curiam). "Damages that are foreseeable are recoverable in negligence actions * * *." *Id.*

The record indicates that the plaintiff's medical expert also was his surgeon. He testified that at the time of trial, the plaintiff already had been scheduled for a future surgical procedure to be performed on his injured ankle. He stated that his standard fee for such a procedure is in the range of $3,000. This assertion was supported by similar bills for the same surgical procedure performed by the surgeon on the plaintiff in the past. We also note that defense counsel failed to request an itemization by the jury of any award it might make in favor of the plaintiff and, because of the general verdict, we are unable to review the propriety of the award, if any, that might have been made by the jury for future medical expenses.

■■■ In view of the fact that the plaintiff's future medical expenses were foreseeable, and the medical expert's estimation of the cost of the planned surgery was reasonable, the trial justice did nor err in permitting the jury to consider an award for the projected cost of the plaintiff's future medical expenses in calculating his damages, and we are unable to determine

from the general verdict whether in fact any such award, or the amount thereof, was ever made by the jury.

## 8. Compensable Scarring.

At trial, the plaintiff testified that he had very visible scarring on his leg that caused him great embarrassment. This was the only evidence of scarring that was presented to the jury. The defendant contends that because there was no independent proof of the alleged scarring and no indication that the scarring was permanent, the jury should have been permitted to award only nominal damages on this issue.

Scars always are a relevant item in a plaintiff's claim for damages in a personal injury case; particularly when, as here, those scars are claimed to cause the plaintiff great embarrassment. In *Arlan v. Cervini*, 478 A.2d 976 (R.I.1984) we said:

> "mental suffering, which may include nervousness, grief, anxiety, worry, shock, humiliation, embarrassment, or indignity, arising from consciousness of a facial or bodily scar, is a compensable element of damages." *Id.* at 980 (overruling *Halladay v. Ingram*, 78 R.I. 464, 82 A.2d 875 (1951), where we held that shame or humiliation resulting from consciousness of scarring was not an element of damages).

In this case, defense counsel could have requested the plaintiff to display his leg to the jury in an attempt to dispute the existence of the scars. However, presumably as part of his trial strategy, defense counsel failed to do so. The defendant cannot now complain that the scars did not exist. With respect to his contention that a plaintiff must establish that his or her scars are "permanent" before being entitled to compensation, we believe that, based upon the surgeon's testimony about the surgery performed upon the plaintiff's leg and the plaintiff's description of those scars to the trial jury, the jury certainly could have concluded that the scars were permanent in nature, as well as embarrassing to the plaintiff. Thus, the scars properly were compensable as part of the plaintiff's overall injuries. Accordingly, we conclude that the trial justice did not err in permitting the jury to award damages to the plaintiff to compensate him for the scars about which he had testified.

For the foregoing reasons, the defendant's appeal is denied, and the judgment of the Superior Court is upheld. The papers in this case are remanded to the Superior Court.