**BLUE COAST, INC.**

v.

**SUAREZ CORPORATION INDUSTRIES.**

No. 2003–455–Appeal.

Supreme Court of Rhode Island.

March 10, 2005.

Brian C. Newberry, Esq., Providence, for Plaintiff.

Lauren E. Jones, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

FLAHERTY, Justice.

Blue Coast, Inc., and Suarez Corporation Industries once enjoyed a lucrative and harmonious business relationship in the production of costume jewelry for marketing and sale through the latter's national mail-order catalog. In 1999, however, all good will between the two companies vanished when Suarez's upper management suspected that Blue Coast had failed to adhere to certain contractual obligations set forth in the parties' production and manufacturing agreements. A civil action ensued, and from a once fruitful and profitable business relationship evolved a jury trial replete with allegations of fraud, breach of contract, breach of warranty, and unethical business practices. Ten years after these two entities first embarked on their business relationship, we are asked to bring finality to difficult legal questions attributable to the litigation occasioned by their unfortunate fallout.

## I

## Background

The plaintiff, Blue Coast, Inc. (Blue Coast), was a one-man wholesale jewelry manufacturing business founded by Jerome Biern in 1995.[1] Running the business from his home in Cranston, Biern engaged Blue Coast in both the resale and production of costume jewelry. When Biern launched his entrepreneurial venture, one of his three original customers was the defendant, Suarez Corporation Industries (Suarez), a direct mail retailer based in Ohio and dealing in the sale of costume jewelry and other products through a national marketing campaign. Over time, Blue Coast became one of Suarez's main jewelry suppliers in the region. The business arrangement proved profitable for both entities, and by 1999, Suarez accounted for more than 90 percent of Blue Coast's production. In 1998, their last full year of cooperation, Blue Coast did approximately $1.7 million in business with Suarez.

Over the years, the parties engaged in a course of dealing that is of particular importance in this case. According to Biern, when Suarez was planning to market a new piece of costume jewelry, it first would send a sample of the prospective piece to various vendors, asking each to submit a price quotation or bid.[2] If Biern was interested in manufacturing the piece, he would submit a price quote. In the event that Suarez found a lower price from another vendor, Biern often was given the opportunity to lower his original offer, rather than lose the potential sale. On other occasions, Suarez would forgo the bidding process altogether and directly solicit Biern to manufacture a specified quantity of jewelry for a certain price.

If Biern "won" the bidding process or otherwise accepted a direct solicitation from Suarez, that company would forward him a specifications sheet that set forth the production information, including price, manufacturing process, and place of manufacture for the jewelry items. If the product was a plated item, Biern then

---

1. While we realize that Blue Coast, a corporation, was the actual contracting party in the business relationships described herein, we shall in this opinion use Mr. Biern's name synonymously with Blue Coast.

2. Oftentimes these samples would originate with vendors themselves, who would create prototype pieces and send them to Suarez. There was testimony at trial that other vendors would then be given the opportunity to manufacture these pieces for a lower price. The testimony referred to this process as "cross-quoting."

would add to the product specifications the "milage" intended and return the document to Suarez.[3] After receiving the specification sheet, Suarez would then fax a requisition form detailing a specific delivery date. When he received the requisition form, Biern would either sign off that he could fill the order in accordance with the specifications sheet or he would request more time to do so. In the latter instance, Biern would simply cross off the date and write in another before faxing the form back to Suarez.[4] Because the delivery dates were tight, it was Biern's customary practice to begin manufacturing the product immediately upon returning the requisition form.

Biern testified that after he received the signed requisition form, Suarez would fax him one side of a purchase order. About a week later, Suarez would mail the entire purchase order, which contained legal and contractual language on its reverse side. Included in that language were the following provisions: "All specifications, drawings, and data submitted by Buyer are incorporated and made a part of this order. The terms of this order contain the entire agreement of the parties and no modification of the terms of this order shall be valid unless modified, superseded or otherwise altered by a written instrument by an authorized representative of [Suarez] * * *." By the time Biern received the formal order sheet, however, he

either would be late in the process of manufacturing the goods or, in some instances, already would have shipped them.

## The Dispute

Blue Coast and Suarez maintained a smooth working relationship until February 1999, when Suarez discovered that a number of earrings and chains that it had ordered from Blue Coast were insufficiently plated. After learning of this discrepancy, Suarez's quality assurance manager sent Biern a letter informing him of the company's concerns. On March 3, 1999, Biern responded that he was totally unaware of any underplating and that he had taken action to ensure that the plating companies whose services he employed adhered to the milage requirements specified by Suarez.

Despite this bump in the road, Blue Coast and Suarez continued their business association, and shortly thereafter agreed on a contract pursuant to which Blue Coast would produce a large order of gold-plated chains of varying thickness to be marketed by Suarez as the "Regal Gold Chain" set. The specifications called for 50 mils of gold plating on each of the chain styles in the set. Blue Coast began production on the Regal set and, by April 1999, had shipped 106,000 gold-plated chains to Suarez. When it received those items, however, Suarez, alerted by the pre-

3. Blue Coast primarily provided Suarez with gold and silver-plated pieces of costume jewelry of various designs. Plating, an electrochemical process in which gold and silver ions in a solution are deposited onto a base metal, gave the pieces the requisite shine and color necessary to look like authentic gold and silver jewelry. In the jewelry industry, the amount of plating on such pieces generally is measured in millionths of an inch, called "mils." There is a slight discrepancy in the record about whether the specifications sheets Suarez sent to Blue Coast set forth a specific milage amount or whether Biern

himself would add the milage amount to those documents. Regardless of this discrepancy, Biern testified at trial that he was aware of Suarez's quality control standards, which set forth required milage amounts for each type of jewelry piece produced. Biern testified that those standards called for 50 mils of plating on necklaces and 100 mils for earrings.

4. Biern testified at trial that his requests for additional time were granted "99% of the time."

vious nonconformity, sent some of the chains to be tested at an outside laboratory to ensure that Blue Coast had, in fact, provided the 50 mils of gold layering called for on the specifications sheet. According to Suarez, the test results revealed that the chains had been grossly underplated.

When Suarez informed Biern of the problem with the Regal order, he promptly offered to replate any chains that had not yet been sent out to consumers. However, Biern claimed that he would have to negotiate a new price with respect to any outstanding orders. Also, on April 13, 1999, Biern sent a letter to Suarez regional buyer Dan O'Brien, explaining that the chains were inadequately plated because of a language miscommunication between Blue Coast and its Korean plater.[5] Around that same time, Biern participated in a conference call with Suarez's management, during which Suarez requested that Blue Coast pay for the recall and replating of the approximately 80,000 Regal Chains that previously had been sold and shipped to Suarez customers. Biern flatly refused to participate in the recall, and openly questioned why Suarez would alert its customers to the problem.

Because of Biern's statements during the conference call, Suarez canceled all its outstanding orders with Blue Coast and placed it on a "Do Not Do Business" status. In addition to severing all relations, Suarez also withheld payments due Blue Coast for a number of other items, unrelated to the Regal chains, that Blue Coast previously had shipped. In response, Blue Coast brought a breach of contract action against Suarez, alleging that Suarez owed it $349,794.12 for products produced and shipped prior to its termination as a supplier. Suarez counterclaimed, alleging

breach of contract, breach of warranty, fraudulent misrepresentation, and obtaining money by false pretenses, all in connection with the Regal Gold Chain order. On those claims, Suarez sought damages totaling $164,553.04.

### The Trial

The primary issue at trial concerned the specifics of Blue Coast's contractual obligations to Suarez. Blue Coast's contention was that the paperwork exchanged between the parties, including the specifications sheets and the purchase orders, neither represented nor was intended by the parties to be a complete integration of the agreements between the parties. On this point, Blue Coast asserted that there were numerous oral agreements and understandings reached between Biern and Suarez's regional buyer Dan O'Brien that formed the actual basis of the bargain between the companies, some of which contradicted the documents exchanged by the parties. Blue Coast maintained that it had not breached any of its contracts with Suarez, including that for the Regal Gold Chain set. Suarez, on the other hand, contended that the contracts between the parties were limited to the terms of the formal purchase order, which incorporated by reference the milage amount specified on the requisition form. Thus, Suarez asserted that Blue Coast had willfully breached its written contract to provide 50 mils of gold plating on the Regal Gold Chain set as clearly set forth on the specification sheet and requisition form, both of which were part of the formal purchase order.

Biern was Blue Coast's sole witness at trial, and his testimony painted an interesting picture of his relationship with

---

5. In that letter, Biern claimed that the nonconformity in the plating of the Regal chains was a result of the Korean supplier misinterpreting his instructions to produce "Fifty mils 14kt gold" as "Fifteen mils 14kt gold plating."

Suarez through Dan O'Brien, with whom Biern dealt almost exclusively. According to Biern, O'Brien was under significant pressure to obtain product manufacturing agreements at totally unrealistic prices. Biern testified that because of that pressure, O'Brien advised him to put as much plating on the jewelry pieces as was possible for the agreed price, not necessarily the amount called for in any of the documents or order forms exchanged between Suarez and Blue Coast. On cross-examination, Biern added that he was under the impression that the milage amounts specified on the product worksheets and other written documentation "were nothing but window dressing for top management." Biern reiterated that his standing agreement with O'Brien obligated him to provide the maximum amount of plating possible for the agreed price. Biern also testified that possibly 10 percent of his Suarez orders were underplated in accordance with O'Brien's instructions. Biern added, however, that prior to February 1999, all his products were approved by Suarez's quality control. As a result, Biern concluded that his previous performance, under the arrangement with O'Brien, had been acceptable to Suarez.

Biern also testified to his belief that most of Suarez's other vendors engaged in similar plating practices. As a basis for this contention, Biern said that when Suarez would send him jewelry samples manufactured by other companies for cross-quoting, he would test that jewelry to properly quote a price. According to Biern, those samples were almost always underplated. Biern added that the first time he discovered a variance between a sample and Suarez's plating specifications, he contacted then-regional buyer Lori

Mitchell with regard to the discrepancy. According to Biern, Mitchell directed him to quote the sample. When Biern pressed Mitchell that the sample did not contain the milage set forth on the specifications sheet, she allegedly replied, "Don't go there." Consequently, Biern testified that it was apparent to him from his dealings with both Mitchell and O'Brien that with respect to Suarez's upper management, "the right hand didn't necessarily know what the left hand was doing."

With respect to the Regal Gold Chain set, Biern testified that O'Brien contacted him and asked if he would be willing to supply four gold-plated chains of varying lengths and girth for approximately $1 per piece. Because providing 50 mils of plating on those items would itself cost more than the contract price for each chain, however, O'Brien allegedly instructed Biern to provide only as much plating as possible for the $1 price. Biern testified that he followed O'Brien's instructions when he produced the Regal Gold Chain set.

On cross-examination, Biern testified that he did not tell Suarez's upper management about the understanding with O'Brien during the April 1999 conference call in order to protect O'Brien from the possibility of being fired. Furthermore, Biern admitted that he had falsified his April 1999 letter to O'Brien, but only to keep O'Brien out of trouble with upper management: "Dan told me he was in big trouble with his management and I [wrote the letter] to take some of the blame as to how it could possibly * * * have happened, and hopefully this would have been enough to get past this." [6]

At the close of Blue Coast's case, Suarez moved for judgment as a matter of law,

---

**6.** Biern also testified that he was told by O'Brien what to write in his letter of March 3, 1999, in which Biern expressed surprise with the underplating and assured Suarez that he would direct his plating companies to put the required plating on the pieces.

arguing that the only contract at issue in the case was the written purchase order Suarez sent to Blue Coast. Thus, Suarez argued, Blue Coast's acceptance under the formal purchase order constituted its unequivocal consent to be bound by the terms and instructions therein. Because the purchase order explicitly incorporated the product specification worksheet, Suarez urged that Blue Coast was contractually bound to plate the jewelry as detailed on those worksheets. Suarez also pointed out that the terms and conditions of the purchase order allowed no modification of the specifications incorporated in the purchase order unless in writing. Therefore, evidence of any oral agreements contradicting its terms constituted parol evidence.[7] Separately, Suarez also argued that Biern had failed to introduce any evidence as to damages suffered as a result of Suarez's cancellation of pending orders for goods that had not yet been delivered.

The trial justice denied Suarez's motion on the first ground, noting that a factual dispute existed about the terms of the agreement between the parties:

> "The testimony according to Mr. Biern is that he entered into oral contracts for the delivery of goods, and that the written documents came sometime later. Those written documents may be legal evidence of the terms of the contract, but it's a question of fact for the jury to determine what the specific terms would be."

On the second ground, however, the trial justice agreed that Biern's testimony was vague as to what costs, if any, he incurred as a result of the canceled contracts. The trial justice found no basis in the evidence from which a jury could make a determination of damages and granted Suarez's motion for judgment as a matter of law on those claims only.

Suarez then presented its case. First, Daniel O'Brien testified that failure to comply with the specifications for a product constituted grounds for termination of a contract and that Suarez terminated its relationship with Blue Coast only after discovering severe underplating on the goods manufactured by Blue Coast. Next, Jane C. Hetrick, a quality assurance manager for Suarez, confirmed the results of tests conducted in 1999 that revealed underplating on certain products manufactured by Blue Coast. Lastly, Thomas Betts, current marketing director for Suarez and Dan O'Brien's former supervisor, reiterated O'Brien's testimony that failure to meet product specifications constituted grounds for contract termination, adding that Suarez had refused to pay Blue Coast for past due accounts because of its failure to provide sufficient milage in compliance with those specifications. Betts further asserted that Suarez had suffered $164,553.64 in damages as a result of having to replate and reship the Regal chains.[8]

During the presentation of Suarez's case, an evidentiary question arose that is at issue in this appeal. During trial, Suarez informed Blue Coast that it intended to call as a witness Dr. Raj Mishra. Doctor Mishra was the technical director of Advanced Chemical Company, an indepen-

---

7. Although Suarez raised this argument to support its motion for judgment as a matter of law, the record indicates that it did not object to the introduction of parol evidence at any time during the presentation of Blue Coast's case.

8. On cross-examination, however, Betts contradicted Suarez's contention that the purchase orders represented the entire agreement between the company and its vendors, testifying that there was an understanding that certain late fees, not referenced in the purchase order, were part of their respective production agreements.

dent laboratory that had tested some of Blue Coast's product prior to trial. In a hearing outside the presence of the jury, Suarez expressed its intent to call Dr. Mishra to testify first to his educational background, his employment history, his employment at Advanced Chemical, and the type of work done at Advanced Chemical. Doctor Mishra then would read for the jury the results of numerous tests conducted on several products sent by Blue Coast to Suarez, all of which showed significant underplating.

Blue Coast objected to Dr. Mishra's proposed testimony on the ground that Suarez had failed to disclose Dr. Mishra as an expert witness during pretrial discovery. Blue Coast argued that because the test results required interpretation and were not self-explanatory, Dr. Mishra's testimony constituted expert testimony. Blue Coast also contended that Dr. Mishra's testimony about the results of the tests would constitute double hearsay, since he was not involved in either the actual testing or preparation of the records themselves. In the face of Blue Coast's objection, Suarez maintained that the results were admissible as business records under Rule 803(6) of the Rhode Island Rules of Evidence. It pointed out that, during discovery, it previously had disclosed to Blue Coast that "A representative of Advanced Chemical Co. * * * may testify regarding the results of tests performed by Advanced Chemical Co. on goods provided by Blue Coast to [Suarez]."

After reviewing the test results, the trial justice ruled that Dr. Mishra's proposed testimony would constitute expert testimony under Rule 702 of the Rhode Island Rules of Evidence:

"It is clear that [Suarez] is seeking to get an opinion from someone who has specialized skill or knowledge. In looking through these documents, there is no way that the [c]ourt could hand these documents to the jury and have any expectation that without some explanation of what these documents mean that the jury would have any way to interpret this or have any way to understand what these documents mean at all."

The trial justice ruled that Suarez's failure to disclose Dr. Mishra as an expert violated its obligation to disclose the names of any experts it intended to call as witnesses in the case. As a result, the trial justice deemed Dr. Mishra's proffered testimony unduly prejudicial to Blue Coast, and she prevented Suarez from calling him as a witness.

The jury returned a verdict in favor of Blue Coast in the amount of $349,249.12 for its breach of contract claim, but also found for Suarez on its breach of contract counterclaim in the amount of $48,715. The jury found in favor of Blue Coast on each of Suarez's additional counterclaims.

Suarez subsequently moved for a new trial under Rule 59 of the Superior Court Rules of Civil Procedure. In support of its motion, Suarez maintained that: (1) the jury verdict was contrary to the law and evidence because the testimony at trial indicated that the purchase orders could not be orally modified; (2) the jury verdict was contrary to the weight of the evidence because Biern's testimony was not credible; and (3) the jury's verdicts conflicted and did not respond to the merits of the controversy. The trial justice denied the motion, concluding that sufficient evidence was presented at trial from which the jury could conclude that the contracts between Blue Coast and Suarez were formed based on the oral communications between Biern and O'Brien. She stated that she agreed with the result, pointing out that even Betts's testimony indicated that the agreements between Suarez and its suppliers were not limited to the terms of purchase

orders. The trial justice also noted that Suarez had failed to produce evidence of any products other than the Regal Gold Chain set that were defective, entitling Blue Coast to be paid for items on which Suarez had withheld payment. Lastly, the trial justice found that the award on Suarez's counterclaim reflected the jury's "careful analysis" of the damages alleged by Suarez. Suarez timely filed a notice of appeal.

## II

### Issues on Appeal

Suarez alleges three specific errors by the trial justice. First, Suarez asserts that the trial justice abused her discretion in excluding Dr. Mishra's testimony about the test results of Advanced Chemical Company, which were admissible independently as business records under Rule 803(6). Next, it argues that the trial justice overlooked and misconceived material evidence and was clearly wrong in denying its motion for a new trial because the evidence adduced at trial plainly indicated that purchase orders could not be orally modified. Third, Suarez contends that the trial justice overlooked and misconceived material evidence and was clearly wrong in denying its motion for a new trial because the amount of the verdict rendered on its breach of contract counterclaim lacked any calculable basis in the evidence. For the reasons stated herein, we deny defendant's appeal.

## III

### Analysis

**Doctor Mishra's Testimony & Advanced Chemical Test Results**

Suarez first contends that the trial justice's conclusion that Dr. Mishra's testimony as to the test results of Ad-

vanced Chemical Corporation would constitute expert testimony was erroneous and an abuse of discretion. We disagree. Rule 702 of the Rhode Island Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." However, it is well accepted in this jurisdiction that "[w]hen a party seeks to introduce, through expert testimony, novel scientific or complex technical evidence, it is proper for the trial justice to exercise a gatekeeping function." *Owens v. Silvia*, 838 A.2d 881, 891 (R.I. 2003) (citing *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 685 (R.I.1999)). Accordingly, we give great deference to a trial justice's ruling on the admissibility of an expert witness's proffered testimony, and will uphold such rulings provided that the trial justice has soundly and judicially exercised his or her discretion "in the light of reason applied to all the facts and with a view to the rights of all the parties to the action, * * * and not arbitrarily or willfully, but with just regard to what is right and equitable under the circumstances and the law." *Morra v. Harrop*, 791 A.2d 472, 477 (R.I.2002) (quoting *DeBartolo v. Di-Battista*, 117 R.I. 349, 353, 367 A.2d 701, 703 (1976)).

It is clear to us from the on-the-record statements of its counsel that Suarez intended to introduce Dr. Mishra as an expert witness and not merely in the capacity of a records custodian. There can be no other reasonable explanation for the stated intention to inform the jury about the witness's education and employment history other than to demonstrate his expertise in explaining the test results and thus attaching the weight of expert scientific validation to that evidence.

Because Suarez failed to disclose Dr. Mishra as an expert witness in its response to the discovery requests made by Blue Coast, the trial justice was within her authority to exclude his testimony. Rule 26(b)(4)(A) of the Superior Court Rules of Civil Procedure provides "[a] party may * * * require any other party to identify each person whom the other party expects to call as an expert witness at trial[.]" We previously have held that failure to notify an opposing party of the identity of an expert pursuant to a properly phrased interrogatory propounded in reliance upon Rule 26(b)(4)(A) may bar the expert from testifying at trial. *See Owens,* 838 A.2d at 902; *Neri v. Nationwide Mutual Fire Insurance Co.,* 719 A.2d 1150, 1152 (R.I. 1998). *See also Gormley v. Vartian,* 121 R.I. 770, 403 A.2d 256 (1979). In this case, Suarez failed to disclose Dr. Mishra during discovery, thereby depriving Blue Coast of both the opportunity to prepare for adequate cross-examination or to secure its own expert. Thus, it is clear that Blue Coast was prejudiced by tardy notice of Dr. Mishra's testimony.

 Furthermore, it is apparent from our review of the test results that the trial justice did not abuse her discretion in denying their admission as business records under Rule 803(6). Once Dr. Mishra's proffered testimony was excluded because the trial justice determined it to be expert in nature, Suarez's counsel nimbly attempted to convert the witness into a records custodian in an effort to admit the test results without his testimony. Although they may have been relevant to the cause on trial, the trial justice excluded the test results because she found that the jury could not understand them without explanation. We hold that determination to be within her discretion. Rule 403 of the Rhode Island Rules of Evidence provides that "[relevant] evidence may be ex-

cluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As we have recognized, the question of whether to admit or exclude evidence under Rule 403 is within the sound discretion of the trial justice. *State v. Martinez,* 824 A.2d 443, 449 (R.I.2003). "This Court will not interfere with the trial justice's determination unless a clear abuse of discretion is apparent." *Cuddy v. Schiavonne,* 568 A.2d 1387, 1389 (R.I.1990) (quoting *State v. Martini,* 460 A.2d 936, 938 (R.I.1983)). In this case, the trial justice, after examining the Advanced Chemical test results that Suarez sought to introduce, found them to be confusing, based on scientific principles and terminology, and beyond the comprehension of the jury without explanation by an expert. We have reviewed those documents and do not deem the trial justice's conclusion to be erroneous. The documents clearly involve specialized scientific and technical modes of analysis that cannot adequately be understood without the aid of expert testimony. The test results contain numbers and figures that exhibit no readily apparent meaning without explanation and interpretation. Moreover, it is clear that the methods of analysis employed by Advanced Chemical are well beyond the understanding of the average juror.

### Motion for a New Trial

 Suarez next argues that the trial justice should have granted its motion for a new trial because the evidence presented at trial unequivocally established that the terms and conditions on the back of the purchase order became the terms of an integrated contract with Blue Coast, the contents of which could not be modified by any other extrinsic or parol evidence.

Blue Coast, on the other hand, maintains that Suarez waived this argument by failing to renew its Super.R.Civ.P. 50 motion for judgment as a matter of law at the close of all the evidence or following the jury verdict. After carefully reviewing the record of the proceedings below, we accept plaintiff's argument and reject Suarez's contentions.

Suarez belabors the issue of whether the evidence of the oral agreements between Biern and O'Brien could operate to contradict the terms of the written purchase orders exchanged between the companies. It contends that the only supportable conclusion that the trial justice could have reached in this matter is that the terms of the contract between the parties were the writings of the purchase order, including the terms on the reverse side, which incorporated the plating specifications by reference. However, the record indicates that Suarez made this argument at the close of the plaintiff's case in its motion for judgment as a matter of law, which it failed to renew at either the close of the evidence or after the jury's verdict. This failure to renew the motion for judgment as a matter of law after the close of all the evidence is fatal to Suarez's efforts to renew the arguments it now makes before us. *See Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 287 (R.I.1999). Critically, what Suarez does raise in its appeal is the failure of the trial justice to grant its motion for a new trial based on Rule 59.

■ The trial justice's standard of review on a motion for judgment as a matter of law under Rule 50 is starkly distinct from that employed when ruling on a motion for a new trial under Rule 59. In ruling on a motion for judgment as a matter of law, the trial justice must " 'consider the evidence in the light most favorable to the party against whom the motion is made without weighing the evidence or considering the credibility of the witnesses and extract from that record only those reasonable inferences that support the position of the party ˙opposing the motion * * *.' " *AAA Pool Service & Supply, Inc. v. Aetna Casualty and Surety Co.*, 479 A.2d 112, 115 (R.I.1984) (quoting *Fox v. Allstate Insurance Co.*, 425 A.2d 903, 905 (R.I.1981)). If the evidence shows that " 'there exist issues of fact upon which reasonable men may differ, the trial [justice] has no alternative other than to let the jury decide them.' " *Id.*

■ On a motion for a new trial, however, the trial justice acts as a " 'superjuror,' reviewing evidence and assessing credibility." *Crafford Precision Products Co. v. Equilasers, Inc.*, 850 A.2d 958, 963 (R.I.2004). Proceeding on the presumption that the jury instructions are correct, the trial justice may grant a new trial "if 'the verdict is against the preponderance of the evidence and thereby fails to either do justice to the parties or respond to the merits of the controversy.' " *Id.* (quoting *Connor v. Bjorklund*, 833 A.2d 825, 827 (R.I.2003)). We previously have held that a trial justice must undertake at least a three-step approach in ruling on a motion for a new trial. In *State v. Salvatore*, 763 A.2d 985 (R.I.2001), we articulated that process as follows:

"First, 'the trial justice must consider the evidence in light of the charge to the jury, a charge that is presumably correct and fair to the defendant.' Next, the trial justice should form his or her own opinion of the evidence. * * * In doing so, '[t]he trial justice must * * * weigh the credibility of the witnesses and [the] other evidence and choose which conflicting testimony and evidence to accept and which to reject.' * * * Finally, 'the trial justice must determine by an individual assessment of the evidence and in light of the charge to the

jury, whether the justice would have reached a different result from that of the jury.'" *Id.* at 991 (quoting *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994)). If, after reviewing the evidence, the trial justice agrees with the verdict, the analysis is complete and the verdict will stand. *Banach,* 648 A.2d at 1367.

■ In light of the critical differences between these related, yet distinct, tools of civil practice, Suarez's decision to challenge the trial justice's ruling by moving for a new trial under Rule 59, instead of by renewing its motion under Rule 50, was a procedural misstep that results in a waiver of the argument it presently makes on appeal to this Court. The essence of that contention is that under any of the various scenarios advanced by Blue Coast, there was a failure to produce evidence sufficient to create a question for the jury upon which reasonable minds could differ. Its argument, therefore, posits a threshold challenge to the adequacy of the evidence in the same manner as would a motion for judgment as a matter of law. However, it is well settled in Rhode Island that "if one party makes a motion for judgment as a matter of law at the close of the opponents case and then presents evidence on his or her own behalf, the motion must be renewed at the close of all evidence." *Skaling,* 742 A.2d at 287. "If the motion was not so renewed, the earlier motion is deemed waived and may not be reviewed." *Id.*

Because Suarez failed to renew its motion for judgment as a matter of law following either the presentation of its evidence or the rendering of the jury verdict, we conclude that it waived the opportunity to reassert the arguments that it previously had made to the court at the close of plaintiffs case. The record indicates that although Suarez had ample opportunity to renew its Rule 50 motion, it neglected to do so. In addition, while Suarez maintains on appeal that the trial justice erred in allowing testimony that contradicted the terms contained in the documents exchanged between the companies, the record indicates that it never objected to any of the parol evidence offered during the trial. Moreover, at the conclusion of the trial, Suarez did not elect to challenge the courts jury instructions, as it is entitled to do under Rule 51(b). In view of this record, we are of the opinion that Suarez may not avoid the harsh impact of Rule 50s provisions concerning the time for the making and renewal of motions under that rule by simply couching its previously raised arguments in a motion for a new trial after the jury verdict.

Furthermore, it is apparent that when ruling on Suarez's motion for a new trial as to Blue Coasts breach of contract claim, the trial justice properly exercised her function under Rule 59 in light of the evidence and instructions presented to the jury. This Court has held that "[we] will affirm a trial justices decision on a motion for a new trial as long as the trial justice conducts the appropriate analysis, does not overlook or misconceive material evidence, and is not otherwise clearly wrong." *Morrocco v. Piccardi,* 674 A.2d 380, 382 (R.I. 1996). A reading of the transcript from the hearing on Suarez's motion indicates that the trial justice fully reviewed and summarized the evidence and testimony offered by both parties during the trial and thereafter agreed with the verdict. The record provides no indication that the trial justice overlooked or misconceived any of the material evidence adduced at trial. In light of the criteria set forth in *Salvatore* and *Banach,* we discern no error in the trial justices assessment of the matter and therefore decline to disturb her ruling on Suarez's motion for a new trial.

 Suarez also challenges the trial justices denial of its motion for a new trial as to its breach of contract counterclaim, alleging that the jury's award of $48,715 lacks any reasonable basis in the evidence. Addressing the adequacy of jury awards, we have held that, "[i]n our opinion, whenever the amount of damages arrived at by a jury can be supported by a reasonable hypothesis based on the evidence and instructions received by the jury, such amount should not be disturbed if it is otherwise not excessive." *Shanley v. Miletta*, 93 R.I. 98, 104, 171 A.2d 437, 440 (1961). In addition, "a damage award may be disregarded by the trial justice and a new trial granted only if the award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled." *Shayer v. Bohan*, 708 A.2d 158, 165 (R.I.1998) (quoting *Hayhurst v. LaFlamme*, 441 A.2d 544, 547 (R.I.1982)).

In this case, Suarez claimed damages totaling $164,553.04. That figure included $126, 269.28 for the replacement and reshipment of 19,486 Regal Gold Chain orders, as well as damages claimed for additional incremental costs, including the replating of other jewelry previously shipped by Blue Coast, postcards, and testing. In her decision denying Suarez's motion for a new trial, however, the trial justice made the following findings:

"[I]t is clear * * * that that damage award represents some compensation to the defendant for what [the jury] deemed to be a breach of the contracts involving the [Regal Gold Chains]. It includes, in this [c]ourt's opinion, and the evidence supports this, some damages suffered by the defendant for the increase in the replacement cost, damages for some of the shipping charges and replating charges. The [c]ourt, in fact, came up with a method based upon the testimony and the jury's finding on that claim which is fairly close to the actual figure that I know seemed at first to be somewhat mysterious as to the attorneys representing both sides. But * * * if you take a look at [d]efendant's [Exhibit] O, if you look at the damage figures, excluding the first one, and if you add into the sum those remaining damages, * * * if you add to that sum some of the other testimony regarding damages for replacement and shipment, then you actually do get fairly close to the * * * specific figure that the jury came up with."

It is clear to us from the trial justices decision that the she applied the proper standard in ruling on Suarez's motion for a new trial. Her analysis and discussion indicate that she undertook a comprehensive review of the evidence and agreed with the verdict. Suarez has failed to demonstrate that the trial justice in any way overlooked or misconceived material evidence or was otherwise clearly wrong in her assessment of the jury's calculation of damages on Suarez's successful counterclaim. To the contrary, the jury's award is susceptible to a variety of reasonable explanations that are supportable in both the figures submitted by the parties and the testimony of the witnesses presented. As a result, we decline to disturb the trial justices denial of Suarez's motion for a new trial.[9]

9. On February 17, 2005, the appellant filed a motion to hold this Court's decision in abeyance and to remand this matter to the Superior Court. The basis of the motion was the Stark County, Ohio, indictment of the appellee's president Jerome Biern for grand theft, by deception, of between $5,000 and $100,000 from the appellant Suarez Corpora-

## IV

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

tion Industries, to which Biern pleaded guilty on February 9, 2005. Appellee Blue Coast, Inc. objected to Suarez's motion. This Court, after considering the motion and the objection thereto, denied the motion on March 3, 2005. The Ohio proceeding does not alter our decision.