DECISION
Before the Court are various post-trial motions following a jury verdict against Defendant Bancorp Rhode Island, Inc. d/b/a BankRI (BankRI). At trial, the jury found BankRI liable for breach of contract, negligence, and intentional infliction of emotion distress.[1] The jury awarded Plaintiff Empire Merchandising Corporation (EMC) $1,415,047, representing the value of the business that was lost. Plaintiff Joseph Pietrantonio (Mr. Pietrantonio) was awarded $147,960 as lost wages and $347,718.47 as damages for his claim of emotional distress. The amounts awarded to Plaintiffs against BankRI, with interest, totaled $3,244,706.81. Following the verdict, BankRI brought the instant Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial pursuant to Super. R. Civ. P. 50 and 59 respectively.
 I Facts and Travel *Page 2 
The instant matter arises out of BankRI's alleged mismanagement of EMC's commercial bank accounts and line of credit, as well as its alleged misconduct in connection with an embezzlement scheme executed by an EMC employee. EMC is a closely held Rhode Island corporation that owned and operated several "Dollar Depot" retail stores in Seekonk, Massachusetts and Pawtucket and Cumberland, Rhode Island. Mr. Pietrantonio is the President and sole stockholder. BankRI is a state-chartered financial institution with banking branches throughout much of Rhode Island.
 A Mr. Pietrantonio's Banking Relationship with BankRI
In or about 1971, Mr. Pietrantonio, on behalf of EMC, opened a business checking account with a predecessor of BankRI. At that time, Mr. Pietrantonio was required to sign a Certificate of Authority and Signature Card. Both Mr. Pietrantonio and his former wife, Joann Pietrantonio (Ms. Pietrantonio) (collectively referred to herein as "Pietrantonios"), were authorized users.[2] In 1985, Mr. Pietrantonio, on behalf of EMC, applied for and received a $100,000 line of credit with BankRI. In connection therewith, Mr. Pietrantonio provided BankRI with a personal guaranty and EMC granted a security interest in the entirety of its inventory.
In the years following, Mr. Pietrantonio executed additional loan agreements as was necessary from time to time to renew EMC's line of credit. Specifically, on or about January 16, 2004, Mr. Pietrantonio renewed EMC's line of credit with BankRI by executing a business loan agreement (Business Loan Agreement) providing for a $250,000 line of credit. See Pis.' Exs. 1, 9. *Page 3 
In accordance with the Business Loan Agreement, Mr. Pietrantonio was authorized "to request advances and authorize payments under the line of credit." See Pis.' Ex. 1. As security for the line of credit, EMC again granted to BankRI a security interest covering its business assets and Mr. Pietrantonio again executed a commercial guaranty (Guaranty) personally guarantying repayment to BankRI.See Pls.' Ex. 78; see also Defs.' Ex. U. On or about February 7, 2005, Mr. Pietrantonio renewed EMC's line of credit and the terms of the Business Loan Agreement for another year by executing a loan modification agreement and reaffirmation of guarantor. See Pis.'Exs. 2-3.
 B The Embezzlement Scheme
Prior to their divorce, the Pietrantonios split responsibility for the management and operations of the Dollar Depot stores. Until 2002, Mr. Pietrantonio oversaw the daily operations of the stores and purchased the inventory, while Ms. Pietrantonio was responsible for EMC's daily accounting and bookkeeping. Following the Pietrantonios' divorce, however, Rhonda Hastings (Ms. Hastings) became EMC's bookkeeper. Among her responsibilities were: (1) posting all purchase invoices and printing all checks; (2) mailing all checks; (3) reconciling all business checking accounts on a monthly basis; (4) preparing, accounting for, and recording all deposits of cash to be picked up by Dunbar Armored Services; and (5) managing all incoming and outgoing mail.See Defs.' Ex. A10. Because Ms. Hastings had little bookkeeping experience, Mr. Pietrantonio asked Marilyn Solomon (Ms. Solomon), EMC's certified public accountant, to oversee Ms. Hastings. Ms. Solomon, however, was unable to devote adequate time to EMC, and Mr. Pietrantonio subsequently hired the Labushes. *Page 4 
With access to and control of EMC's daily cash flow, in or about 2004, Ms. Hastings began to embezzle EMC's funds. As part of her scheme, Ms. Hastings would properly record EMC's sales on the weekly sales and reconciliation reports, but withhold amounts of cash from its bank deposits for her own personal use. See
Defs.' Exs. L, M, O, A10. During this time, approximately 946 checks were presented for payment to BankRI upon insufficient funds as a result of cash shortfalls in EMC's accounts. See Pis.' Ex. 19.
In an attempt to conceal the fact that she had been diverting monies generated from EMC's daily operations, Ms. Hastings obtained online access to EMC's line of credit and transferred funds to its operating accounts. See Defs.' Ex. A10. In so doing, Ms. Hastings was able to substitute missing cash with line of credit borrowings and cover checks drawn on these otherwise deficient accounts.[3] See id. Additionally, Ms. Hastings further concealed her scheme by altering and/or manipulating several monthly bank statements from BankRI, various weekly reconciliation reports, Dunbar Armored Services reports, bank deposit tickets, and disbursement checks. Id. Between March 2005 and August 2005, Ms. Hastings maxed-out EMC's $250,000 line of credit with BankRI, and overall, she embezzled approximately $540,000 of EMC's cash.[4] Id. *Page 5 
 C The Aftermath
After discovering that Ms. Hastings had accessed EMC's line of credit, Mr. Pietrantonio contacted BankRI to inform them that an employee had accessed it without his authorization and requested that BankRI forgive the debt. BankRI refused and thereafter continued to charge interest on EMC's balance. On or about January 23, 2006, Bank RI, through counsel, informed EMC and Mr. Pietrantonio that the entire outstanding balance (including interest, attorneys' fees, and costs) was immediately due and payable. See Pis.' Ex. 9. BankRI informed EMC and Mr. Pietrantonio "that if the Indebtedness . . . [was] not paid to BankRI in full via certified funds or bank check on or before March 8, 2006, BankRI [would] exercise its rights and remedies to collect the Indebtedness from each of [EMC] and [Mr. Pietrantonio]." Id.
In the aftermath of Ms. Hastings' embezzlement scheme, EMC required immediate financing in order to continue purchasing merchandise, meeting its ongoing payroll obligations, and paying business expenses. EMC, however, was unable to obtain additional financing. See Pis.' Exs. 10, 15. In particular, on or about March 31, 2006, Rockland Trust denied Mr. Pietrantonio's application for a $300,000 loan. See Pis.' Ex. 10. Rockland Trust stated that its reason for denying the application was EMC's "inability to provide collateral as [the] existing lender [was] unwilling to release [its] collateral . . . [and EMC's] inability to repay the requested loan based on historical operations."Id.
Despite a personal loan to EMC from Mr. Pietrantonio in the amount of $75,000 and an additional $100,000 bank loan from Citizens Bank, by the end of 2006, EMC lacked sufficient funding to continue its operations. On January 31, 2007, EMC notified its creditors that of its *Page 6 
remaining stores, the Cumberland Store had closed on January 5, 2007, and the Pawtucket Store would close on February 4, 2007. See Pls.' Ex. 18.
In May 2008, Plaintiffs filed a seventeen-count Complaint against BankRI and the Labushes. As relevant to these post-trial motions, following the conclusion of the trial and prior to charging the jury, this Court heard arguments on BankRI's Motion for Judgment as a Matter of Law. In that connection, the Court granted BankRI's motion as to Counts II (Breach of Oral Contract), III (Breach of Implied-in-Fact Contract), IV (Breach of Contract by Estoppel), VII (Intentional Interference with Advantageous Relations), VIII (Negligent Infliction of Emotional Distress), X (Unjust Enrichment), and XI (Declaratory Relief). Following a hearing on the jury instructions and related matters, closing arguments, and the Court's charge, the jury deliberated and returned a verdict in Plaintiffs' favor. The Court now has before it BankRI's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial.
 II Standard of Review
Rule 50 of the Superior Court Rules of Civil Procedure governs motions for judgment as a matter of law. It provides in pertinent part:
 "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Super. R. Civ. P. 50(a)(1) (emphasis added).
When addressing a renewed motion for judgment as a matter of law, the trial justice must
 "`consider the evidence in the light most favorable to the party against whom the motion is made without weighing the evidence or considering the credibility of the witnesses and extract from that *Page 7 
record only those reasonable inferences that support the position of the party opposing the motion. . . .'" Blue Coast, Inc. v. Suarez Corp. Indus., 870 A.2d 997, 1009 (R.I. 2005) (quoting AAA Pool Serv. Supply, Inc. v. Aetna Cas. Sur. Co., 479 A.2d 112, 115 (R.I. 1984)).
If, after such a review, "there are factual issues upon which reasonable people may have differing conclusions," the motion for judgment as a matter of law must be denied. Broadley v.State, 939 A.2d 1016, 1020 (R.I. 2008); Blue Coast, Inc.,870 A.2d at 1008. "However, if the only reasonable conclusion that can be drawn from the evidence is that the plaintiff is not entitled to recover, then the motion must be granted." KenneyMfg. Co. v. Starkweather Shepley, Inc.,643 A.2d 203, 206 (R.I. 1994) (citing Hulton v. Phaneuf,85 R.I. 406, 410, 132 A.2d 85, 88 (1957)). Thus, for a defendant to prevail on its motion, the Court must find that no reasonable jury could have found for plaintiff based upon the evidence presented.See McLaughlin v. Moura, 754 A.2d 95, 98 (R.I. 2000).
Rule 59 of the Superior Court Rules of Civil Procedure governs motions for a new trial. It provides in pertinent part:
 "A new trial may be granted to all or any of the parties and on all or part of the issues, (1) in an action in which there has been a trial by jury for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of this state." Super. R. Civ. P. 59(a).
In comparison with Rule 50, when ruling on a motion for a new trial, the Court must evaluate the evidence against a less rigorous standard.[5] Under Rule 59, the trial justice functions as a "superjuror." Candido v. University of R.I.,880 A.2d 853, 856 (R.I. 2005). Although it "need not perform an exhaustive analysis of the evidence," the Court is required to independently *Page 8 
weigh, evaluate, and assess the credibility of the trial witnesses and evidence. Id.; Reccko v. Criss Cadillac Co., Inc.,610 A.2d 542, 545 (R.I. 1992) (citing Zarrella v. Robinson,460 A.2d 415, 418 (R.I. 1983). The judge may accept some or all of the evidence and may reject testimony if it is impeached or contradicted by other testimony or circumstantial evidence, or if the judge finds it is inherently improbable or inconsonant with undisputed physical facts or laws. See Barbato v.Epstein, 97 R.I. 191, 193, 196 A.2d 836, 837 (1964). In addition, the trial judge may add to the evidence by drawing proper and consistent inferences. Id. at 193-94, 196 A.2d at 837.
As part of its review, the Court must also presume the correctness of jury instructions. See Blue Coast, Inc.,870 A.2d at 1008 (citing Crafford Precision Prods. Co. v.Equilasers, Inc., 850 A.2d 958, 963 (R.I. 2004)). Although, the Court must determine, in light of the charge to the jury, whether it would have reached a result different from that of the jury, the Court is cautioned against substituting its own conclusions from those of the jury or disturbing the jury's findings merely because it would have made a contrary finding on the same evidence.Id.; see also Turgeon v. Davis,120 R.I. 586, 590, 388 A.2d 1172, 1175 (1978). Ultimately, the Court may grant a new trial "if the verdict is against the preponderance of the evidence and thereby fails to either do justice to the parties or respond to the merits of the controversy." Blue Coast,Inc., 870 A.2d at 1008 (citing Crafford Precision,850 A.2d at 963) (quotations omitted); Botelho v. Caster's,Inc., 970 A.2d 541, 546 (R.I. 2009) (quoting Ruggieri v. Big GSupermarkets, Inc., 114 R.I. 211, 216, 330 A.2d 810, 812 (1975)) (explaining that a jury's verdict must be set aside and a new trial ordered where a court's "`superior judgment' tells [the trial justice] that the verdict is against the preponderance of the evidence and thereby fails to either do justice to the parties or respond to the merits of the controversy"). If, however, the *Page 9 
Court determines that the evidence "is evenly balanced or is such that reasonable minds in considering the same evidence could come to different conclusions, the trial justice must allow the verdict to stand." Botelho, 970 A.2d at 545 (citing Marcotte v.Harrison, 443 A.2d 1225, 1232 (R.I. 1982)); Bajakian v.Erinakes, 880 A.2d 843, 851 (R.I. 2005).
 III Discussion A Trial Exhibits
Before proceeding with the substance of this Decision, the Court must first address a matter of concern that arose in connection with the parties' trial exhibits and the jury's deliberations. Specifically, during its deliberations, the jury brought to the Court's attention several instances of unadmitted exhibits being inadvertently or improperly included with the trial exhibits presented to them for consideration.[6] Upon learning of these improprieties, the Court charged counsel for both parties with the task of re-examining the full set of exhibits provided to the jury. Following their review, counsel again certified for the Court the accuracy of the materials. Notwithstanding, while reviewing the trial exhibits in conjunction with the preparation of this Decision, the Court identified several trial exhibits — marked only for identification — which may have inadvertently been presented to the jury during their deliberations, as well as several others trial exhibits — marked as full — which may not have been submitted to the jury.[7] *Page 10 
In that connection, the Court has provided the parties with an opportunity to represent their recollection of the events that transpired in compiling and submitting the trial exhibits to jury and to present their arguments as to whether the errors warranted a new trial or necessitated setting aside the jury's verdict. Although, at this time, the Court is unable to determine with any certainty whether the exhibits identified by the Court were actually submitted to or considered by the jury, the Court will address the parties' arguments with respect to the exhibits at issue.
Central to the parties' dispute on this issue, is a question of whether the Court must presume prejudice from the mere fact that unadmitted exhibits may have been submitted to and considered by the jury. Although the Court is faced with a matter of first impression in Rhode Island, the jurisprudence of other states, having faced similar quandaries, is instructive.
As a general matter, issues of jury misconduct arise where a juror allegedly is exposed to outside influences such as extraneous evidence, reviews unadmitted exhibits (such as may have occurred here), or engages in unauthorized communications. See generally, 75B Am. Jur.2dTrial §§ 1301-1454 (2007). It is a fundamental principle of our judicial system that every party is entitled to an impartial and unprejudiced jury, free from misconduct, and for that reason, courts must ensure that a jury's conduct does not affect a party's substantial rights. See id.; see alsoSpeed v. DeLibero,215 Conn. 308, 313, 575 A.2d 1021, 1023 (1990). However, the Connecticut Supreme Court has on numerous occasions affirmed that not every instance of juror misconduct requires or warrants a new trial. See Speed,215 Conn. at 313, 575 A.2d at 1023; *Page 11 Williams v. Salamone,192 Conn. 116, 120-22, 470 A.2d 694, 697-8 (1984). Rather, the burden is on the moving party in a civil proceeding to establish the denial of a fair trial sufficient to set aside the original verdict.See id.
Furthermore, numerous jurisdictions have directly addressed and rejected the presumption of prejudice. In Maryland Dep. Ins. FundCo. v. Billman, the Court of Appeals of Maryland rejected outright the intermediate appellate court's presumption of prejudice[8] where eighty-seven unadmitted documents were delivered to the jury in addition to previously admitted documents.See 321 Md. 3, 34, 580 A.2d 1044, 1059 (1990)). In so holding, the Court of Appeals analogized the matter to instances where a jury considers evidence that is later determined to have been erroneously admitted and cautioned that courts should be reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless substantial injustice or prejudice is shown.Id. at 16, 580 A.2d at 1050 (affirming that the Court will not reverse an error below unless the error was both manifestly wrong and substantially injurious) (citations omitted). The Court reasoned that what constitutes prejudice warranting reversal is often case-specific and requires a balancing of:
 "the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case. It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry. [I]t is the function of the trial judge when ruling on a motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion." Id. at 17-18, 580 A.2d at 1051
(internal citations omitted) (emphasis added). *Page 12 
Consequently, the Court agrees that the issue of prejudice is a case-specific inquiry, and therefore, is of the opinion that the better rule requires the moving party — here BankRI — to demonstrate that the misconduct complained of resulted in probable prejudice.See DeLibero, 215 Conn. at 314, 575 A.2d at 1023;Salamone, 192 Conn. at 122, 470 A.2d at 698 (explaining that the more prudent and reasonable test is "whether the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror"); see also Koch v. Rist89 Ohio St.3d 250, 252, 730 N.E.2d 963, 966 (2000) (affirming that a trial court ought not to reverse a judgment because of the misconduct of a juror unless prejudice to the complaining party is shown); State v. Fenton, 620 P.2d 813, 815 (Kan. 1980) (affirming that in both civil and criminal cases, a party claiming prejudice has the burden of showing that its rights have been substantially prejudiced); Meirick v. Weinmeister,461 N.W.2d 348, 350 (Iowa Ct. App. 1990) (affirming that a moving party must show misconduct was calculated to, and with reasonable probability did, influence the verdict); Richard S. v. OverlakeHosp. Med. Ctr.,59 Wash. App. 266, 271, 796 P.2d 737, 741 (1990) (explaining that where the misconduct is the supposed interjection of extrinsic evidence, the test is whether the alleged information actually constituted misconduct, and if so, whether it affected the verdict);Cleveland v. Wong,237 Kan. 410, 425, 701 P.2d 1301, 1313 (1985) (stating that jury's use of extraneous material will not constitute a ground for reversal unless it is shown to have substantially prejudiced the rights of a party).
Here, the gravamen of BankRI's motion surrounds the submission of Exhibits 83 and 84 to the jury. The Court finds, however, that BankRI has failed to adequately establish probable prejudice with respect to all the issues identified with the trial exhibits. In particular, where, as here, the sum and substance of Exhibits 83 and 84 has previously been admitted through the *Page 13 
parties' testimony, BankRI has failed to establish that submission to the jury was substantially injurious. See Beahm v.Shortall 279 Md. 321, 332, 368 A.2d 1005, 1012 (1977) (holding that the improper receipt of evidence was not substantially injurious where the substance of the testimony had previously been admitted through the party's testimony).
Moreover, the Court's opinion is further tempered by the lack of evidence that the exhibits at issue were actually submitted to or reviewed by the jury.[9] See Wong,237 Kan. at 425, 701 P.2d at 1313 (finding that defendant failed to establish prejudicial misconduct where there was no evidence that the extraneous materials were actually considered by the jury). Notwithstanding the fact that the Court discovered the unadmitted exhibits included with the set of admitted trial exhibits, counsel have represented to the Court the diligence with which the materials were compiled and certified the accuracy of the materials on several occasions, and the Court is simply unwilling to set aside a verdict given the inconclusiveness of the matter.
Taking into consideration the Court's uncertainty over whether the jury actually examined the unadmitted exhibits and BankRI's failure to establish that the jury's review would have resulted in prejudice, the Court finds it inappropriate to set aside the jury's verdict or grant a new trial based on the foregoing issues. Accordingly, the Court will proceed with the remainder of BankRI's post-trial motions. *Page 14 
 B BankRI's Post-Trial Motions
The basis for BankRI's Renewed Motion for Judgment as a Matter of Law is three-fold. BankRI asserts that judgment as a matter of law must be granted with respect to Mr. Pietrantonio's claim for intentional infliction of emotional distress because Plaintiffs failed to present proof of medically established physical symptomatology or that BankRI's conduct was extreme and outrageous. In connection with the negligence claim, BankRI argues that Plaintiffs failed to establish that BankRI owed a duty outside of the parties' written contracts and that the economic loss doctrine precludes recovery where purely economic losses are claimed. Lastly, BankRI maintains that Mr. Pietrantonio's claim for lost wages is legally and factually unsupported, and for that reason, judgment as a matter of law is appropriate.
BankRI's Motion for a New Trial can essentially be broken down into four parts. BankRI alleges that the Court allowed Plaintiffs to advance a David-and-Goliath theme through a series of improper influences which appealed to the jury's passion, prejudice, and sympathy and prevented it from presenting its defenses. In particular, it asserts prejudicial error in the Court's failure to: (1) grant judgment as a matter of law as to the intentional infliction of emotional distress, negligence, and implied covenant of good faith and fair dealing claims; (2) specifically instruct the jury on the degree of conduct required for extreme and outrageous behavior; and (3) limit Thomas Tartar's testimony about "common practices" in the banking industry. BankRI further maintains that the Court should set aside the jury's verdict because the jury interrogatories are inconsistent, Plaintiffs' expert rendered an opinion of EMC's lost business value based on an unsupported valuation methodology, and Mr. Pietrantonio's claim for lost wages is legally and factually unsupported. *Page 15 
 1 Intentional Infliction of Emotional Distress a Extreme and Outrageous Behavior
To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show `"extreme and outrageous conduct on the part of the defendant.'" Jalowy v. Friendly Home, Inc.,818 A.2d 698, 707 (R.I. 2003) (quoting DiBattista v. State,808 A.2d 1081, 1088 (R.I. 2002)). Although in the first instance, the determination of whether a defendant's conduct is so extreme and outrageous so as to permit recovery is a matter of law to be decided by the court, "[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Restatement (Second) Torts, § 46 cmt. h. As guidance for deciding whether the evidence introduced at trial can support a jury's finding of extreme and outrageous conduct, our Supreme Court has adopted the standard set forth in the Restatement (Second) Torts § 46. SeeJalowy, 818 A.2d at 707.
In view of the record before it, the Court cannot under the circumstances state that the only reasonable conclusion to be drawn is that Mr. Pietrantonio is not entitled to recover. Kenney Mfg.Co., 643 A.2d at (citing Hulton,85 R.I. at 410, 132 A.2d at 88); McLaughlin, 754 A.2d at 98. The evidence and testimony indicate that after discovering Ms. Hastings' embezzlement scheme, Mr. Pietrantonio contacted BankRI and requested that it forgive the indebtedness incurred by EMC as a result of Ms. Hastings' unauthorized draws on the line of credit. Despite Mr. Pietrantonio's efforts, BankRI denied his request and instead sought to collect the entire balance (including interest, attorneys' fees, and costs) owed in that connection. *Page 16 See Pis.' Ex. 9. Under the circumstances, EMC was unable to continue purchasing inventory or covering expenses, and consequently, sought but was unable to obtain adequate additional financing. See Pls.' Exs. 10, 15, 18. Without additional financing, however, EMC was forced to close its stores.See id.
Accordingly, viewed in the light most favorable to the Mr. Pietrantonio, the Court cannot find that no reasonable jury could have concluded that BankRI's conduct was extreme and outrageous based upon the evidence presented. SeeMcLaughlin, 754 A.2d at 98. Therefore, the Court denies BankRI's Renewed Judgment as a Matter of Law as to this claim.
Furthermore, the Court does not find that its jury instructions with respect to extreme and outrageous behavior were prejudicial.[10] Without a doubt, BankRI correctly asserts that § 46 is the applicable standard by which a jury may impose liability on BankRI. Indeed, in Champlin v. Washington TrustCo., our Supreme Court directly addressed the question of what standard of liability to impose upon a creditor whose actions allegedly inflict emotional distress on a debtor, and thereby adopted the higher threshold of § 46 requiring extreme and outrageous conduct. See 478 A.2d 985, 987-88 (R.I. 1984); Restatement (Second) Torts § 46 (2011). *Page 17 
This Court, however, is not required to adopt the precise language requested by BankRI. See Riley v. Stone,900 A.2d 1087, 1092 (R.I. 2006) (explaining that "[w]hen formulating jury instructions, a trial justice need not adopt the specific language that the parties proposed"). Rather, the Court fulfilled its obligations, where, as here, it framed the issues for the jury and instructed them, inter alia, that liability may be imposed on BankRI only if Mr. Pietrantonio established that BankRI's conduct was extreme and outrageous and that his emotional distress was severe. Id. (quoting Morinville v. Old Colony Co-operativeNewport Nat'l Bank, 522 A.2d 1218, 1222 (R.I. 1987)) (stating that a court fulfills its obligations by framing the issues in such a way that the instructions "`reasonably set forth all of the propositions of law that relate to material issues of which the evidence tends to support'"). Having so instructed the jury, the Court was not obligated to further detail the provisions of the Restatement to the jury. See State v. Hurteau,810 A.2d 222, 224 (R.I. 2002) (quoting State v. Krushnowski,773 A.2d 243, 246 (R.I. 2001)) (affirming that "a trial justice need only `adequately cover [] the law' when instructing a jury") (alteration in original).
 b Medically Established Physical Symptomatology
It is well settled that the torts of negligent and intentional infliction of emotional distress generally require a plaintiff to allege and prove that medically established physical symptomatology accompanied his or her distress. See Francis v. AmericanBankers Life Assur. Co. of Fla., 861 A.2d 1040, 1046 (R.I. 2004). In so holding, the Court in Francis relied upon and reaffirmed our Supreme Court's prior pronouncements regarding claims of emotional distress. See, e.g., Swerdlick v.Koch, 721 A.2d 849, 863 (R.I. 1998); Clift v. NarragansettTelevision *Page 18 L.P., 688 A.2d 805, 813 (R.I. 1996); Reilly v. U.S.,547 A.2d 894, 896 (R.I. 1988). Specifically, to prevail on a claim for intentional infliction of emotional distress, a party must prove:
 "(1) the conduct [was] intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct [was] extreme and outrageous, (3) there [was] a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question [was] severe." Swerdlick, 721 A.2d at 862-63 (citations omitted).
Additionally, "at least some proof of medically established physical symptomatology" is required for a successful intentional infliction of mental distress action. Id.; see alsoDiBattista, 808 A.2d at 1089 (affirming that a party asserting a claim involving negligent or intentional infliction of emotional distress may not rely upon unsupported conclusory assertions of physical ills, but rather, must produce evidence of the requisite physical manifestations of their alleged emotional distress);Vallinato v. DiSandro, 688 A.2d 830, 839 (R.I. 1997) (requiring claims of psychic and physical injury to be supported by competent expert medical opinion regarding origin, existence, and causation).
In requiring medically established physical symptomatology as an element of a claim for intentional infliction emotional distress, our courts have applied a stricter standard of proof than that applied by the Restatement and many other states. SeeReilly, 547 A.2d at 899 n. 3; see also Restatement (Second) Torts § 46 cmt. k (2011) (liability for intentional infliction of emotional distress is not limited to those cases where there has been bodily harm). The primary basis for the Supreme Court's adherence to the requirement of medically established physical symptomatology is to safeguard against bogus or exaggerated emotional distress claims. See Hawkins v. Scituate OilCo., 723 A.2d 771, 773 (R.I. 1999) (acknowledging that physical symptomatology has been required "to safeguard against bogus or exaggerated emotional-damage claims"); see alsoVallinato, 688 A.2d at 838 (affirming that plaintiff's subjective *Page 19 
declarations of emotional distress were insufficient to withstand a motion for directed verdict where she failed to provide competent supporting medical evidence tending to prove that her alleged ills were proximately caused by defendant's conduct and were not simply the aftermath of a recent divorce). In essence, given the subjective nature of emotional distress, the physical symptomatology requirement aids a court in substantiating a party's claim.See Reilly, 547 A.2d at 897; Adams v. Uno Rests.,Inc., 794 A.2d 489, 493 (R.I. 2002) (explaining that expert medical testimony is ordinarily deemed necessary to assist the factfinder in determining the validity and causal relationship of any emotional distress).
However, despite our Supreme Court's pronouncements inSwerdlick, the requirement of medically established physical symptomatology is not absolute. Rather, a survey of our case law reveals that the Court has often waived the symptomatology requirement where the circumstances and injuries complained of were "within the realm of ordinary human experience." Seegenerally, Fortes v. Ramos, No. 96-5663, 2001 WL 1685601, at *5 (R.I. Super. Dec. 19, 2001) (Hurst, J.). It appears that Rhode Island has developed a somewhat "ad hoc" approach to the symptomatology requirement driven by
 "the source of the mental suffering at issue, the perceived trustworthiness of the claim, the reliability of proof, the practical politics of legal versus moral culpability, and the degree of faith that the courts are willing to place in the trial court and the jury's ability to discern bogus or exaggerated claims." Id.
And given the underlying rationale behind the requirement, the courts' reliance on this "reliability quotient" seems a logical and practical approach to matter.
For example, in Arlan v. Cervini, our Supreme Court waived the symptomatology requirement where the plaintiff — who had suffered extensive facial injuries and was left with permanent scarring following an automobile accident — complained of mental anguish caused by *Page 20 
the physical injuries to her body. See478 A.2d 976, 978 (R.I. 1984). There, plaintiff alleged that as result of her injuries, she became depressed, quit school, gained a significant amount of weight, and in general suffered a "cataclysmic loss of self-esteem." Id. On appeal, the Court sustained plaintiffs appeal that the trial justice erred in instructing the jury that mental suffering arising from consciousness of a facial scar was not compensable. Id. at 980. In so holding, the Court declared that mental suffering, which may include subjective suffering such as "nervousness, grief, anxiety, worry, shock, humiliation, embarrassment, or indignity, arising from consciousness of a facial or bodily scar, is a compensable element of damages."Id.
In Hawkins, our Supreme Court reversed the trial justice's decision to grant defendant's motion for judgment as a matter of law for lack of corroborative expert medical testimony.[11]See 723 A.2d at 773. In so doing, the Court reasoned:
 "In property-loss cases like this one . . . where a tortfeasor's wrongdoing has interfered with the plaintiffs rightful occupancy of his or her premises, it is unnecessary to mandate evidence of physical symptomatology plus medical-causation expertise before allowing such plaintiffs to recover damages for their resulting discomfort and annoyance." See id (citations omitted).
For the Court, the lack of medical testimony was not dispositive because: *Page 21 
 "property-loss victims like the [plaintiff] typically will experience inconvenience, discomfort, and annoyance following such a tangible deprivation as occurred in this case-albeit no corporeal symptoms or medical expertise corroborates such a loss — we have no need to insist upon the heightened levels of proof that we would otherwise require in establishing pure emotional-distress claims." Id. (emphasis added).
Similarly, in Adams, a former employee alleged that he had been unlawfully terminated — in violation of the Whistleblowers' Protection Act, G.L. 1956 § 28-50-1, et seq. — for notifying the Department of Health about the unsanitary conditions existing in defendant's kitchen. See 794 A.2d at 490-91. There, the evidence before the Court indicated that following his termination, plaintiff lost his military security clearance and was barred from accompanying his National Guard unit to Germany as a result of the argument with his manager. Id. at 492-93. Despite plaintiff's failure to present expert medical testimony on causation, our Supreme Court again upheld the jury's award of damages for the plaintiff's resulting economic loss and emotional distress.Id. at 493-94. In so holding, the Court acknowledged its prior precedent requiring medically established physical symptomatology, but reasoned:
 "[W]e believe than ordinary lay person or trial juror would be capable of determining without the aid of expert medical testimony whether emotional distress and humiliation could ordinarily and naturally follow from such events. Trial jurors, we are satisfied, do no leave their common sense in the cloakroom when they come to sit in the courtroom." Id. at 493 (emphasis added).
For the Court, the lack of expert medical testimony was simply not dispositive where the jury had before it "clear, objective and uncontroverted evidence. . . ." Id.
As recently as 2007, our Supreme Court has reaffirmed that in certain circumstances, "`an ordinary lay person or trial juror [is] capable of determining without the aid of expert medical testimony whether emotional distress and humiliation could ordinarily and naturally follow from such events.'" See Shoucair v. BrownUniv., 917 A.2d 418, 433 (R.I. 2007) *Page 22 
(quoting Adams, 794 A.2d at 493). In Shoucair, plaintiff alleged that university administrators had retaliated against him — in contravention of Rhode Island's Fair Employment Practices Act, G.L. 1956 § 5-28-1, et seq., and Title VII of the Civil Rights Act of 1964 — after he opposed what he perceived to be discriminatory interviewing practices. See 917 A.2d at 426. The Court, consistent with its analysis in Adams, upheld the jury's award of compensatory damages for plaintiff's resulting emotional distress despite his failure to present expert medical testimony relating to the causal relationship between his injuries and the university's misconduct. Id. at 432-33. The Court stated:
 "We are satisfied that in the context of this case the jury did not need expert medical testimony to ascertain whether the resulting emotional distress [plaintiff] described to them was a natural consequence of such a devastating personal and professional blow." Id. at 433 (emphasis added).
In effect, it appears that our Supreme Court has deemed the lack of medically established physical symptomatology inconsequential in those cases where the circumstances provide sufficient indicia of reliability and trustworthiness to support the claim for thought-based harm and jurors have the capacity to assess the appropriate measure of compensation that they should award. Rightly so, tangible events such as bodily injury, trespass, or the invasion of a protected legal right, and the natural consequences of those events, are clearly within the realm of lay experience and something for which expert opinion is certainly unnecessary.
Following that logic, the Court is resolute in its belief that based on the circumstances before it, the additional safeguard of medically established physical symptomatology would be equally superfluous. Here, the record clearly reflects that over the course of sixteen months BankRI refused to forgive the debt owed on the line of credit or to subordinate its lien on EMC's inventory. Mr. Pietrantonio provided uncontroverted testimony that as a result of BankRI's *Page 23 
conduct he suffered from headaches, stomachaches, and a loss of sleep. Additionally, the testimony of Mr. Pietrantonio's former wife, that she had witnessed his distress in the form of vomiting, a change in personality, and substantial irritability, clearly corroborates and substantiates his claims.
In the face of such testimony, the Court is satisfied that the ordinary lay person or juror would be capable of determining, without the aid of expert medical testimony, that Mr. Pietrantonio's distress was the natural consequence of BankRI's actions. This is not a case in which the subject matter is wholly scientific or so far removed from the usual and ordinary experiences of the average lay person that expert testimony is essential; rather, Mr. Pietrantonio's loss of his business and the effects of BankRI's continued efforts to collect the debt owed on the line of credit are clearly "within the realm of ordinary human experience." Therefore, Plaintiffs' failure to present evidence of medically established physical symptomatology is not dispositive.
For that reason, and the reasons previously set forth above, the Court finds that Mr. Pietrantonio's claim of intentional infliction of emotional distress was properly presented to the jury and BankRI's Renewed Motion for Judgment as a Matter of Law is denied as to this claim.
Correspondingly, the Court does not find that it committed prejudicial error in allowing Mr. Pietrantonio's claim to be presented to the jury. The jury had before it competing evidence surrounding the repayment of the line of credit indebtedness. The jury, based on a preponderance of the evidence before it, could have properly concluded that BankRI's conduct in insisting on repayment of the debt and refusing to release its lien was so extreme and outrageous *Page 24 
so as to warrant a finding of liability.[12] Thus, the Court denies BankRI' s Motion for New Trial as to this claim.
 2 Negligence
BankRI next asserts that Plaintiffs have failed to establish a set of specific facts that would trigger a duty of care outside the terms of the written contracts between the parties. BankRI also maintains that the economic loss doctrine bars EMC's right to recover under a theory of negligence.
It is well settled that `"[a] defendant cannot be liable under a negligence theory unless the defendant owes a duty to the plaintiff"Santucci v. Citizens Bank of R.I.,799 A.2d 254, 256 (R.I. 2002) (quoting Ferreira v. Strack,636 A.2d 682, 685 (R.I. 1994)). It is the prerogative of the Court to determine whether a duty exists in a particular case.[13]Id. (citing Ohms v. State *Page 25 Dep't of Transp., 764 A.2d 725, 727 (R.I. 2001) (per curiam);Volpe v. Fleet Nat'l Bank, 710 A.2d 661, 663 (R.I. 1998) (stating that "[w]hether a duty of care runs from a defendant to a plaintiff is a question of law for the court to decide");Banks v. Bowen's Landing Corp.,522 A.2d 1222, 1224 (R.I. 1987).
Despite BankRI's assertions, this Court has on a prior occasion expressly "recognize[d] that a duty of ordinary care extends from a bank to its customers" independent of any contract between the bank and its customers. See Ciccone v. Pitassi, No. 97-4180, 2004 WL 2075120, at *6 (R.I. Super. Aug. 13, 2004) (relying on Mutual Serv. Cas. Ins. Co. v. Elizabeth StateBank, 265 F.3d 601, 618-19 (7th Cir. 2001) (recognizing that the implied duty of care between a bank and its customers is derived from the common law, embraced by the UCC, and will support recovery in either contract or tort) and Congregation of the Passion, HolyCross Province v. Touche Ross Co.,636 N.E.2d 503, 515 (Ill. 1994) (emphasizing that because the duty to observe reasonable professional competence exists independently of any contract, the economic loss doctrine does not bar recovery in tort)). In so holding, the Court analogized "the relationship between a bank and its customers [to] that [of an] accountant and client or attorney and client" and reasoned:
 "In handling basic transactions, a bank makes decisions independent of its customers and the contracts it executes with its customers. Moreover, customers expect their bank to possess knowledge and expertise in addition to the bank's ability to fulfill its contractual responsibilities. Finally, the relationship between a bank and customer, unlike that between, for instance, an architect and his or her client, results in an intangible product." Id.
By applying this Court's prior reasoning to the matter at hand, it necessarily follows that under the circumstances BankRI owed EMC a duty of ordinary care. *Page 26 
Furthermore, although Plaintiffs' banking expert, Thomas Tartar (Tartar), was precluded from directly testifying as to standards in the banking industry, his testimony as to customs and practices was properly before the jury.[14] Here, the Court declared as a matter of law that a duty of ordinary care extended from the BankRI to EMC, and Mr. Tartar's testimony about common practices in the banking industry, explicated for the jury the duty as recognized by this Court. See Scittarelli v. Providence Gas Co.,415 A.2d 1040, 1043 (R.I. 1980) (recognizing that a standard of care may be evidenced through customary practices in the industry);Muncie Aviation Corp. v. Party Doll Fleet, Inc.,519 F.2d 1178, 1180-81 (5th Cir. 1975) (affirming that "[e]vidence of custom within a particular industry . . . is admissible as bearing on the standard of care. . . . Compliance or noncompliance with such custom, though not conclusive on the issue of negligence, is one of the factors the [jury] may consider in applying the standard of care."); Jemison v. Pfeifer,152 A.2d 697, 699 (Pa. 1959) (citations omitted) (confirming that "the custom or practice prevailing in a particular business . . . is a most important factor in determining the question of negligence. Such testimony is admissible when offered by defendant in an attempt to disprove negligence, as well as when offered by plaintiff to prove negligence."). *Page 27 
Additionally, in this instance, the economic loss doctrine is inapplicable. See Ciccone 2004 WL 2075120, at *5 (citingInsurance Co. of N. Am. v. Cease Elec., Inc.,674 N.W.2d 886, 892 (Wis. Ct. App. 2003)) (stating that the "applicability of the economic loss doctrine to a particular factual scenario constitutes a question of law"). Under the economic loss doctrine "a plaintiff is precluded from recovering purely economic losses in a negligence cause of action." Franklin GroveCorp. v. Drexel, 936 A.2d 1272, 1275 (R.I. 2007) (quotingBoston Inv. Prop. No. 1 State v. E.W. Burman, Inc.,658 A.2d 515, 517 (R.I. 1995)). In other words, "`a plaintiff who suffers only monetary injury as a result of the conduct of another . . . is limited to recovery under the law of contract.'" E.W.Burman, Inc., 658 A.2d at 517 (quoting Reeder R. Fox et al.,Riding the Choppy Waters of East River: Economic Loss DoctrineTen Years Later, 64 Def. Couns. J. 260, 260 (1997));see also Franklin Grove Corp.,936 A.2d at 1275 (citations omitted) (explaining that "when parties have contracted to protect against potential economic liability . . . contract principles override tort principles and, thus, purely economic damages are not recoverable").
In the context of the service industry, courts have adopted divergent views concerning the applicability of the economic loss doctrine. See Ciccone,2004 WL 2075120, at *4 (citations omitted). This Court, adopting the Illinois Supreme Court's view, previously determined that:
 "`the [economic loss] doctrine is applicable . . . only where the duty of the party performing the service is defined by the contract that he executes with his client. Where this duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty.'" Ciccone, 2004 WL 2075120, at *5 (quoting Congregation of the Passion, 636 N.E.2d at 515).
Therefore, having recognized that a duty of ordinary care extended from BankRI to EMC, outside of their express contracts, it follows that the economic loss doctrine is inapplicable and *Page 28 
does not preclude EMC's negligence claim. For that reason, and the reasons set forth above, the Court finds that EMC's claim of negligence was properly presented to the jury. BankRI's Renewed Motion for Judgment as a Matter of Law is denied as to this claim.
Correspondingly, the Court also rejects BankRI's assertion that the Court's instruction, that a duty of ordinary care existed outside of the written contacts between BankRI and EMC, improperly advanced Plaintiffs' alleged David-and-Goliath theme. Clearly, in view of this Court's holding, the jury was properly instructed and allowed to consider whether BankRI breached the duty of ordinary care owed to EMC. Moreover, as previously articulated, the Court finds that Mr. Tartar's uncontroverted testimony about common practices in the banking industry properly assisted the jury in determining whether a breach occurred. In light of the foregoing, the Court does not find that the jury's verdict was the result of prejudicial error or against a preponderance of the evidence. Therefore, BankRI's Motion for a New Trial is denied as to this claim.
 3 Implied Covenant of Good Faith and Fair Dealing
BankRI similarly maintains that the Court's refusal to grant judgment as a matter of law on EMC's implied covenant of good faith and fair dealing claim improperly allowed the jury to consider whether BankRI acted in "bad faith" in trying to collect on the line of credit and further advanced Plaintiffs' David-and-Goliath theme. The Court, however, does not find that it committed prejudicial error by permitting the jury to consider whether BankRI breached this implied covenant.
Despite BankRI's best efforts to convince it otherwise, the Court is resolute in its belief and its instructions that "virtually every contract contains an implied covenant of good faith and *Page 29 
fair dealing between the parties." Dovenmuehle Mortgage,Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (quotingCenterville Builders, Inc. v. Wynne,683 A.2d 1340, 1342 (R.I. 1996)). "The covenant of good faith is regarded as a counterpromise that the promisee will act in a manner consistent with the purpose of the contract." Ross-Simons ofWarwick, Inc. v. Baccarat, Inc., 66 F. Supp. 3d 317, 330 (D.R.I. 1999); see also IdeFarm Stable, Inc. v. Cardi,297 A.2d 643, 644-45 (1972) (affirming that such a covenant insures that the parties' contractual objectives may be achieved). And it is against this backdrop, therefore, that the Court finds that the jury was appropriately charged with a determination of whether BankRI's actions were free from arbitrary and unreasonable conduct.Ross-Simon, 66 F. Supp.2d at 329 (citingPsaty Fuhrman, Inc. v. Housing Auth.,76 R.I. 87, 92, 68 A.2d 32, 35 (1949)); see alsoHord Corp. v. Polymer Research Corp. of Am.,275 F. Supp. 2d 229, 238 (D.R.I. 2003) (quoting Thompson Trading,Ltd. v. Allied Breweries Overseas Trading Ltd.,748 F. Supp. 936, 942-43 (D.R.I. 1990)) (acknowledging that "`a party's actions must be viewed against the backdrop of contractual objectives in order to determine whether those actions were done in good faith'").
As a result, having properly submitted EMC's claim to the jury, it necessarily follows that the Court did not commit prejudicial error. Further, where, as here, the record reflects that the jury considered the evidence before it and declined to extend liability to BankRI for this claim, the Court finds no indication that jury was motivated by passion, prejudice, sympathy, or improper influences. Rather, the jury's determination further supports the Court's belief that the verdict was the result of reasonable minds and a balanced approach. Accordingly, the Court denies BankRI's motion as to this claim. *Page 30 
 4 Breach of the Business Loan Agreement
BankRI argues that the Court must set aside the jury's verdict on the breach of the Business Loan Agreement because there is no evidence that providing online access to Ms. Hastings was the proximate cause of EMC's damages. The Court, however, disagrees.
In its charge, this Court instructed the jury that it could find that BankRI's breach of Business Loan Agreement was the proximate cause of EMC's harm if the harm suffered would not have occurred but for the alleged breach by BankRI and was a natural and probable consequence of the alleged breach. Against this backdrop and upon a review of the evidence and testimony before the jury, the Court finds that a preponderance of the evidence supports the jury's finding of proximate cause. Here, the evidence and testimony established that BankRI permitted Ms. Hastings to access the line of credit online without Mr. Pietrantonio's authorization. This access allowed Ms. Hastings to max-out the line of credit, continue embezzling EMC's funds, and leave EMC without sufficient capital to purchase additional inventory or cover its expenses.[15] Although Mr. Pietrantonio informed BankRI that the line of credit was accessed by an unauthorized employee, BankRI nonetheless demanded repayment of the debt created by Ms. Hastings and refused to release its lien on EMC's assets. See Pis.' Ex. 9. Mr. Pietrantonio further testified, that under these circumstances EMC lacked access to and was *Page 31 
unable to obtain sufficient additional financing to continue operating the stores — despite numerous attempts — and therefore, was forced to close the business. See Pis.' Exs. 10, 15, 18.
Thus, the Court is of the opinion that in light of Plaintiffs' credible testimony and the evidence before it, the jury could have reasonably concluded that BankRI's breach of the Business Loan Agreement was the proximate cause of EMC's damages. It is certainly no stretch of the imagination that having allowed Ms. Hastings to max-out EMC's line of credit and refused to forgive the debt or release the lien, BankRI was the substantial or primary cause of EMC going out of business. Accordingly, the Court finds that the jury's verdict was not against a preponderance of the evidence, and denies BankRI's Motion for a New Trial as to this claim.
 5 Other Prejudicial Errors
BankRI further asserts that the Court improperly allowed Plaintiffs' counsel to argue in his closing that Plaintiffs' relationship with BankRI was analogous to the relationship between David and Goliath. It is axiomatic that "[although counsel undeniably has the privilege of engaging in all fair comment on behalf of his client, he exceeds this privilege when he attempts to appeal solely to the prejudice and passion in the minds of the jurors, thereby diverting their minds from the case at issue."Norlin Music, Inc. v. Keyboard 88 Inc.,425 A.2d 74, 75-76 (R.I. 1981). In particular, courts have deemed it "improper for counsel to make such statements in his [or her] argument [where they] are calculated to prejudice the jury against a party who is a corporation merely because of its big corporate status." Id. at 76.
However, the determination of the extent of permissible comment and argument by counsel rests primarily in the discretion of the trial justice. Twachtman v. Connelly,106 F.2d 501, 509 (6th Cir. 1939). In this instance, the Court finds that Plaintiffs' reference to a David-and-Goliath *Page 32 
relationship during closing arguments, an allegation that was supported by the evidence, neither exceeded the proper bounds of counsel's privilege nor amounted to clear prejudice.[16]See id (acknowledging that a trial justice's refusal to sustain objections to an allegedly improper argument in a civil action will not be disturbed on appeal unless the refusal constitutes clear prejudice to the moving party). Indeed, in its jury instructions, this Court on several occasions advised the jury that all parties were entitled to a fair and impartial consideration of all the evidence and counsels' opening and closing arguments were not evidence upon which to base its decision. SeeAccardi v. Full Channel TV, Inc.,771 A.2d 908, 909-10 (R.I. 2001) (rejecting claim for new trial where the trial justice, in his charge to the jury, correctly informed the jury that statements of counsel were not evidence upon which the verdict could be based); Norlin Music Inc.,425 A.2d at 76 (explaining that in cases where it does not appear the jury verdict was influenced by the improper remarks or the improper references are dissipated by a curative instruction, our Supreme Court will not disturb the ruling of the trial justice in denying a motion for a new trial). And having so instructed the jury, the Court may now presume its instructions were followed.See Accardi, 771 A.2d at 910.
Additionally, the Court's judgment is further tempered by BankRI's failure to object at the time the comment was made. SeeKay v. Menard, 754 A.2d 760, 769 (R.I. 2000) (citingBarnes v. Quality Beef Co., 425 A.2d 531, 534-35 (R.I. 1981)). Having failed to object to this remark when it was made, BankRI should not be heard to raise such objection, particularly where its failure to object prevented this Court from issuing a curative instruction or assessing the effect of the statement upon the jury at that time. See Barnes,425 A.2d at 534-35 (citations *Page 33 
omitted); McGovern v. Lord,91 R.I. 392, 396-97, 162 A.2d 799, 801-02 (1960). Accordingly, under the circumstances, the Court rejects BankRI's claim of prejudice and finds a new trial is unwarranted.
Similarly, the Court finds no merit in BankRI's claim that by permitting the jury to consider an overwhelming number of improper influences, the Court deprived BankRI of a fair opportunity to present its defenses. As previously set forth, no extraneous claims were presented to the jury for its consideration. Rather, BankRI, like Plaintiffs, was appropriated an adequate opportunity to argue its claims and present its case to the jury, and counsel may not now fault this Court for its own tactical and discretionary decisions. The jury had before it evidence and testimony relating to claims by all parties, and it was free to weigh, evaluate, and assess the credibility of the witnesses and evidence as it saw fit.
In that connection, the Court sees no indication that: (1) the jury's verdict was motivated by passion, prejudice, sympathy, and other improper influences; (2) BankRI was prevented from presenting its claims and defenses; or (3) the jury's verdict was against a preponderance of the evidence. For that reason, the Court denies BankRI's Motion for a New Trial as to this claim.
 6 Inconsistent Interrogatories
Separate and apart from the issue of prejudice, BankRI contends that a new trial is warranted because the jury's interrogatory answers are inconsistent. Our Supreme Court has on numerous occasions affirmed that inconsistent verdicts or jury interrogatories may support a basis for a new trial. SeeWalker v. St. Laurent,103 R.I. 636, 639, 240 A.2d 414, 416 (R.I. 1968); Hill v.Cabral, 66 R.I. 145, 147-48, 18 A.2d 145, 147-48 (R.I. 1941). Generally, a court will grant a new trial where the jury's answers to interrogatories "are irreconcilably *Page 34 
inconsistent." See Miyamoto v. Lum,104 Hawai`i 1, 8, 84 P.3d 509, 516 (Hawai`i 2004); Dunbar v.Thompson, 79 Hawai`i 306, 312, 901 P.2d 1285, 1291 (Hawai`i App. 1995) (internal quotation marks and citation omitted) (explaining that "[a]nswers to a special verdict are to be construed in the context of the surrounding circumstances and in connection with the pleadings, instructions, and issues submitted").
In this instance, the Court does not find the jury's answers are necessarily inconsistent. See Miyamoto,104 Hawai`i at 8, 84 P.3d at 516 (citing Carr v. Strode,79 Hawai`i 475, 489, 904 P.2d 489, 504 (1995)) (explaining that a "verdict will not be disturbed if the answers can be reconciled under any theory"). Although the jury found BankRI liable for breach of contract, it does not necessarily follow that the interrogatories are inconsistent simply because the jury did not impose liability for the implied covenant of good faith and fair dealing claim.See Hord Corp., 275 F. Supp. 2d at 237-38 (citingRoss-Simons, 66 F. Supp.2d at 330) (stating that although every breach of the covenant of good faith and fair dealing implicates a breach of contract, not every breach of contract necessarily involves a breach of the covenant). Indeed, here, it is not inconsistent for the jury to have concluded that providing online access to Ms. Hastings was a breach of the Business Loan Agreement and the proximate cause of EMC's damages, but did not rise to the level of arbitrary or unreasonable conduct sufficient to impose liability for a breach of the implied covenant.
BankRI also asserts that the jury's determination that BankRI did not breach the Deposit Account Agreement is irreconcilable with its determination that BankRI had breached a duty of ordinary care. As previously indicated, however, BankRI owed EMC a duty of ordinary care that existed irrespective of the contracts between the parties.See supra Section III.B.2. Therefore, a finding that BankRI breached the duty of ordinary care was not dependant upon or *Page 35 
in conflict with the jury's findings as to the Deposit Account Agreement. In view of that, the Court denies BankRI's Motion for a New Trial as to this claim.
 7 Gordon's Methodology
BankRI contends that the Court should set aside the jury's verdict because Plaintiffs' expert, Howard Gordon (Mr. Gordon), rendered an opinion of EMC's lost business value based upon a valuation methodology that was not supported by the treatise upon which he relied. As a result, it contends, the jury's verdict is against the preponderance of the evidence.
It is the role of the trial justice to act as a "gatekeeper" and to insure that proposed experts are qualified and their testimony is relevant and reliable. Raimbeault v. Takeuchi Mfg. (U.S.),Ltd, 772 A.2d 1056, 1061 (R.I. 2001) (citing Daubert v.Merrell Dow Pharm., Inc.,509 U.S. 579, 589-97, 113 S. Ct. 2786, 2794-99 (1993)). However, once a court is satisfied that the methodology underlying the expert testimony is scientifically valid and relevant, the testimony should be put to the trier of fact to determine the proper weight to be accorded. Raimbeault, 772 A.2d at 1061 (quotingDiPetrillo v. Dow Chem. Co., 729 A.2d 677, 689-90 (R.I. 1999);Kennedy v. Collagen Corp., 161 F.3d 1226, 1230 (9th Cir. 1998) (explaining that the role of the trial justice is to judge the reasoning used in forming the expert conclusion, while the finder of fact determines the weight to accord the testimony).
Here, Mr. Gordon was offered by Plaintiffs to render an opinion as to EMC's value. In light of his testimony, this Court was satisfied that Mr. Gordon's opinion and his gross revenue/sales methodology was both valid and relevant, and consequently admitted him as an expert witness. Upon further consideration of the testimony and evidence before it, the Court finds that Gordon's expert testimony was properly admitted into evidence. Mr. Gordon testified *Page 36 
as to the basis of his opinions and this Court has the duty and discretion to determine the admissibility of the testimony.See Raimbeault 772 A.2d at 1061-62; State v.D'Alessio, 848 A.2d 1118, 1123 (R.I. 2004).
Furthermore, as the "superjuror," the Court's role at this juncture is to weigh, evaluate, and assess the credibility of the trial witnesses and evidence. In this instance, the Court finds Mr. Gordon to be trustworthy and his testimony regarding EMC's lost business value to be credible and reliable. For that reason, the Court is of the opinion that the jury's determination as to the value of EMC's lost business is supported by a preponderance of the evidence. Accordingly, BankRI's Motion for a New Trial is denied as to this claim.
 8 Damages
Lastly, BankRI alleges that no legal or evidentiary basis exists to support Mr. Pietrantonio's claim for lost wages, and thus, it seeks judgment as a matter of law. For their part, Plaintiffs maintain that the breach of contract and negligence claims provide the basis for Mr. Pietrantonio's claim for lost wages. They assert that Mr. Pietrantonio was entitled to the benefit of the contract between EMC and BankRI by virtue of his Guaranty and was owed a duty as EMC's sole officer, director, and stockholder.
In order for Mr. Pietrantonio to have a legally cognizable breach of contract claim he was required to establish the existence of a valid contract, a breach of the contract, and damages resulting from the breach. See Petrarca v.Fidelity Cas. Ins. Co., 884 A.2d 406, 410 (R.I. 2005). In particular, to satisfy his claim, Mr. Pietrantonio was required to demonstrate that BankRI violated a contractual obligation it owed to him. See Demicco v. Medical Assocs. of R.I., Inc., No. 99-251L, 2000 WL 1146532, at *2 (D.R.I. 2000). Here, however, there is no *Page 37 
evidence of a valid contract between BankRI and Mr. Pietrantonio or any contractual obligations owed by BankRI to him. Rather, both the Business Loan Agreement and Deposit Account Agreement — the only express agreements upon which the breach of contract claim could be sustained — are between BankRI and EMC.
Similarly, a claim of negligence requires Mr. Pietrantonio to establish a legally cognizable duty owed by BankRI to him, a breach of that duty, proximate causation between the conduct and the resulting injury, and actual damages. Santana v. RainbowCleaners, Inc., 969 A.2d 653, 658 (R.I. 2009). However, Mr. Pietrantonio has failed to proffer a set of facts from which the Court may find a cognizable duty. Although the Court has recognized the existence of a duty of care between a bank and its customer, irrespective of the parties' contracts, here, that duty is owed to EMC and not Mr. Pietrantonio.
Further, there is simply no legal support for Mr. Pietrantonio's assertion that BankRI owed him a duty by virtue of his status as guarantor of EMC's line of credit or as EMC's sole officer, director, and stockholder. It is well settled that a guarantor may not recover affirmatively on a principal debtor's claims.See Miller v. U.S. Bank of Washington, N.A,72 Wash. App. 416, 423-24, 865 P.2d 536, 541-42 (Wash. App. 1994) (affirming that no rights exists for a guarantor to assert the rights of the debtor other than to raise defensively the claim);see also 38 Am. Jur.2dGuaranty § 100 (2010). The mere fact that Mr. Pietrantonio may receive a pecuniary benefit through EMC's relationship with BankRI does not afford him with a remedy for breach of contract or negligence. See Numerica Sav. Bank, F.S.B. v. MountainLodge Inn, Corp.,134 N.H. 505, 509-10, 596 A.2d 131, 134-35 (1991) (citations omitted). Rather, because the lynchpin of Mr. Pietrantonio's claim for monetary damages is derived solely from EMC's injuries, he cannot establish nor does he possess a claim against BankRI independent of EMC's. *Page 38 See Numerica, 134 N.H. at 509-10, 596 A.2d at 134-35;Miller, 72 Wash. App. at 423-24, 865 P.2d at 541-42 (requiring a guarantor to show a distinct and different injury before maintaining an independent action).
Consequently, having failed to establish the existence of valid contract with BankRI or a legally cognizable duty owed by BankRI, Mr. Pietrantonio's claim for lost wages cannot be maintained under the controlling law. For that reason, the Court grants BankRI's Renewed Motion for Judgment as a Matter of Law as to this claim.[17]
In addition to its challenge of Mr. Pietrantonio's claim for lost wages, BankRI also contends that the Court should grant a new trial because the damage awards are excessive and were motivated by passion, prejudice, sympathy, and other improper influences. The `"task of assessing compensatory damages [, however,] is peculiarly within the province of the jury.'" Soares v. Ann Hope of R.I.,Inc., 637 A.2d 339, 349 (R.I. 1994) (quoting Paquin v.Tillinghast 517 A.2d 246, 249 (R.I. 1986)). "The trial justice may order a new trial on damages if he or she independently concludes `that the award is so excessive in comparison to the injuries sustained as to fail to work substantial justice between the parties.'" Id. Against this legal backdrop, and in light of the record demonstrating the toll that BankRI's actions took on Plaintiffs' business and Mr. Pietrantonio's physical and mental well-being, the Court does not find that the jury's remaining damage awards were either grossly excessive or failed to work substantial justice between the parties.
The jury was instructed that proper damages are the amount of money which will compensate an injured party for the harm or loss which he or she has sustained and restore a party to his or her position prior to the harm or loss. A review of the interrogatories reveals that *Page 39 
the jury, in calculating its damages award, did just that.See Jury Interrogatory Seven. The Court is of the opinion that the jury arrived at each award in a methodical and rationale manner, linking each monetary award to testimony or evidence presented during the trial, and therefore, declines BankRI's motion.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court finds that BankRI has failed to adequately establish probable prejudice with respect to the evidentiary improprieties discovered by the Court, and therefore, will not set aside the jury's verdict or grant a new trial. Furthermore, the Court denies BankRI's Renewed Motion for Judgment as Matter of Law with respect to Mr. Pietrantonio's claim for intentional infliction of emotional distress and negligence. However, the Court grants BankRI's motion with respect to Mr. Pietrantonio's claim for lost wages. For the reasons set forth above, BankRI's Motion for a New Trial is denied in its entirety.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] With respect to Defendants Bernard Labush and Stevan H. Labush (Labushes), the Court granted judgment as a matter of law on Counts XIV, XV, and XVI of the Complaint, and following the verdict, judgment was entered in their favor on Counts XII, XIII, and XVII.
[2] Ms. Pietrantonio jointly owned EMC with her husband until their divorce in 2002. In connection therewith, Ms. Pietrantonio transferred her interest in EMC to Mr. Pietrantonio and waived any claim thereto.
[3] BankRI's policies concerning online cash management and online business banking are set forth in its Online Business Banking Agreement. See Pis.' Ex. 4.
[4] In connection with the related criminal proceeding, Ms. Hastings pled nolo contendere to the crimes of unlawful appropriation over $1000 in violation of G.L. 1956 § 11-41-11.1 and access to computer for fraud.See Pls.' Exs. 20-21. On or about February 23, 2009, Ms. Hastings was sentenced to serve five years (half at ACI and half in home confinement) in addition to probation and a restitution judgment in the amount of $540,000.Id.
[5] If the Court denies BankRI's Rule 50 motion, BankRI may still be entitled to a new trial under Rule 59. On the other hand, if it grants the Rule 50 motion, the Court must either conditionally grant or conditionally deny BankRI's Motion for a New Trial in the event that the grant of the Rule 50 motion is later vacated or reversed.See Super. R. Civ. P. 50(c)(1).
[6] Notably, prior to submitting the set of trial exhibits to the jury, counsel for both parties certified to the Court the accuracy of those materials.
[7] In addition to several other administrative inconsistencies, the following proposed exhibits, marked only for identification, may have been submitted to the jury: (1) Exhibit 83, a letter from Mr. Pietrantonio to Merrill Sherman (Ms. Sherman), CEO of BankRI, dated April 21, 2006; (2) Exhibit 84, a letter from Ms. Sherman to Mr. Pietrantonio dated April 25, 2006; (3) Exhibit A, the Pietrantonios' Property Settlement Agreement, dated February 21, 2002; and (4) Exhibit F, an auditor's analysis for period 1/1/03-9/30/03. Although only page one and three of Exhibit N, a stop-payment request form, were admitted as full, the entire exhibit was included in the materials submitted to the jury. Furthermore, the following exhibits, admitted as full, were never presented to the jury: (1) Exhibit B, Motion to Adjudge Contempt; (2) Exhibit E, Affidavit of Detective Todd Catlow; and (3) Exhibit Q, EMC's Schedules 1 3.
[8] In so holding, the Court of Special Appeals principally relied upon two New York decisions, Public OperatingCorp. v. Weingart, 257 A.D. 379, 13 N.Y.S.2d 182 (1939) (awarding new trial where jury considered unadmitted list of replevied property bearing valuations determined in a manner contrary to court's instructions) and Aiken v. Dunn,1 Misc.2d 215, 147 N.Y.S.2d 450 (St. Lawrence Co. 1955) (denying new trial in personal injury case where juror brought a book entitled, "How to Serve on a Jury" into jury room).
[9] The Court also remains cognizant of Rule 61, which provides:
 "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Super. R. Civ. P. 61.
[10] Specifically, BankRI asserts that the Court erred by rejecting its request to instruct the jury on the following comments to the Restatement:
 "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'" Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998) (quoting Restatement (Second) Torts § 46 cmt. d, at 73) (emphasis in original).
[11] Similarly, in Min v. Pariseau, plaintiff alleged that defendant had trespassed by removing a fence dividing their properties, cutting down a tree on her property, and resetting the fence to a new location. See
No. 03-1033, 2008 R.I. Super. LEXIS 155, at *17 (R.I. Super. Dec. 9, 2008). In connection with her trespass claim, plaintiff further alleged that defendant's actions caused her to suffer loss of sleep and nervousness. Id. at *19-20. The Court, in accord withHawkins, held:
 "Given the egregious nature of [defendant's] actions, and the obvious impact upon [plaintiff], this Court does not require medical records to substantiate the liability of [defendant] for this tort. As there is uncontroverted evidence that [plaintiff] lost sleep and incurred stress as a result of this intentional action of [defendant], plaintiff established that defendant is liable for the intentional infliction of emotional distress." Id. at *21-22 (emphasis added).
[12] Although BankRI asserts that the Court improperly allowed Plaintiffs to establish a causal link between BankRI's alleged breach of the Business Loan Agreement and EMC's damages through evidence of Mr. Pietrantonio's emotional distress claim, Plaintiffs' burden with respect to the breach of contract claim existed independent of any other claims. Seeinfra Section III.B.4. Furthermore, having concluded that Mr. Pietrantonio's emotional distress claim was properly before the jury, BankRI's claim of prejudicial error is simply of no moment.
[13] Although no clear-cut rule exists to determine whether a duty is present in a particular case, our Supreme Court previously articulated several factors that may be considered in determining whether a duty exists. See Banks, 522 A.2d at 1225. Among the factors considered are:
 "(1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach." Id.
Ordinarily, "[u]nless it is specially agreed otherwise, a banking institution and its depositors stand in the debtor and creditor relationship, and [t]he rights and obligations of each with respect to the fund on deposit [are] governed by the terms of the contract which they enter into at the time of the establishment of the relationship." Santucci,799 A.2d at 257 (internal citations omitted); seealso Griffin v. Centreville Sav. Bank,93 R.I. 47, 52, 171 A.2d 204, 206-07 (1961).
[14] See generally, 57A Am. Jur.2dNegligence § 164 (2011) ("Evidence of the custom and practice of persons engaged in a [similar] trade or business . . . is admissible and probative in regard to the requisite standard of care. [It illuminates] the appropriate standard of care . . . as proof of common practice aids in formulating a general expectation as to how individuals will act in the course of their undertaking."); Dan B. Dobbs, The Law ofTorts, § 163, 393-94 (2000) ("Evidence of customary practices is normally admissible to help assist the jury in making an evaluation of the facts and in determining the ultimate issue of negligence. . . . Custom evidence is . . . admissible to assist the jury in determining what reasonable care requires in the circumstances."); Restatement (Second) Torts § 295A cmt. b (2011) ("If the actor does what others do under like circumstances, there is at least a possible inference that he is conforming to the community standard of reasonable conduct; and if he does not do what others do, there is a possible inference that he is not so conforming."); 25 CJSCustoms Usages § 15 (2002) ("In determining whether conduct is objectively reasonable, industry norms may be appropriately considered.").
[15] Throughout its motion, BankRI repeatedly stresses to the Court that Ms. Hastings' access to line of credit could not have been the proximate cause of Plaintiffs' damages because the monies drawn down were transferred to EMC's operating accounts and used to pay legitimate bills and expenses. What BankRI fails to acknowledge, however, is that although the funds were transferred to EMC's accounts and used for legitimate expenses, Ms. Hastings' unauthorized access to and use of the funds allowed her to conceal and perpetuate her embezzlement scheme.
[16] Notably, Ms. Sherman was voted one of the twenty-five most powerful women in banking in 2010. Ms. Sherman testified that BankRI had seventeen branches and its profits in 2010 were approximately $10,000,000. By comparison, EMC grossed approximately $3,000,000 in its best year.
[17] Having granted judgment as a matter of law, the Court denies BankRI's Motion for a New Trial as to this claim. *Page 1